IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LABMD, INC.,

      Petitioner,

v.

      CASE NO. 1:19-mi-00071-WEJ

FEDERAL TRADE COMMISSION,

      Respondent.

# SPECIAL MASTER'S
# REPORT AND RECOMMENDATION

## I.    Background

In an Order entered May 6, 2019 [1], the United States Court of Appeals for the Eleventh Circuit referred Petitioner's Application for Attorney's Fees in Case No. 16-16270 to the United States District Court for the Northern District of Georgia for appointment of a Special Master under Federal Rule of Appellate Procedure 48. This Court, by Order dated May 13, 2019 [2], appointed the undersigned as Special Master. Pursuant to the Eleventh Circuit's Order of May 6, the Special Master was directed to hold a hearing (if necessary), and to recommend factual findings and make a report and recommendation ("R&R") on

the proper disposition of Petitioner's Application for Attorney's Fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d).

The Court held a telephonic status conference with counsel for Petitioner, LabMD, Inc. ("LabMD"), and Respondent, the Federal Trade Commission ("FTC"), on June 13, 2019 [5].  At that conference, the FTC asserted that LabMD had failed sufficiently to support its Application in part because invoices from two of its law firms (Dinsmore & Shohl and Kilpatrick Townsend) were so heavily redacted that it could not tell what services had been performed.  LabMD responded that it had made those redactions to protect the attorney-client privilege. After discussion, the Court allowed LabMD to supplement the record with unredacted fee bills from those firms to be filed under seal.[1]  The Court further allowed the parties to file supplemental briefs regarding those unredacted fee bills. (See Order of June 24, 2019 [6].)  Counsel agreed that a hearing was unnecessary and that the Court could issue its R&R on the record as supplemented.  The Court convened a second telephonic conference with counsel on September 12, 2019 [15], to discuss invoices that the Wilson Elser firm sent to Markel Insurance

---

[1] LabMD subsequently elected to waive the privilege and file unredacted invoices [9]; thus, it was unnecessary to file them under seal.  (See Ltr. of July 30, 2019 [11].)  The unredacted invoices are in this Court's docket (Dinsmore & Shohl [9-1], Kilpatrick Townsend [9-2]).

2

Company for work it performed on behalf of LabMD. The Court addresses this issue infra.

According to the Corrected Application (filed October 24, 2018), LabMD seeks an award under the EAJA of $1,645,551.21 in attorney's fees (based on 6,649.50 hours of work performed by its various counsel) and $212,472.14 in litigation expenses, for a total of $1,858,023.35. Petitioner asserts that it incurred these fees and expenses in connection with (1) its defense of the administrative enforcement action that the FTC filed against it on August 29, 2013 (the "Enforcement Action"), and (2) its September 29, 2016 appeal to the Eleventh Circuit of a cease and desist order issued by the FTC in the Enforcement Action. (Pet'r's Corr. Appl. 1.)

Under the EAJA, a court shall award attorney's fees to a prevailing party "unless the position taken by the United States in the proceeding at issue 'was substantially justified.'" Sullivan v. Hudson, 490 U.S. 877, 884 (1989) (quoting 28 U.S.C. § 2412(d)(1)(A)). For the reasons explained below, the undersigned **REPORTS** that LabMD is the prevailing party in this case and that the FTC's position was not substantially justified; therefore, the undersigned **RECOMMENDS** that LabMD be awarded attorney's fees of **$757,312.44** and expenses of **$85,861.23**, for a total award of **$843,173.67**.

3

## II.    **The EAJA**

LabMD seeks attorney's fees and expenses under the EAJA.  The "purpose of the EAJA is to eliminate for the average person the financial disincentive to challenge unreasonable governmental actions," and to "'curb[] excessive regulation and the unreasonable exercise of Government authority.'"  Comm'r, I.N.S. v. Jean, 496 U.S. 154, 163-65 (1990) (quoting H.R. Rep. No. 96-1418, p. 12 (1980)).  Two provisions of the EAJA are relevant here.  "The first provision allows an award of fees for legal expenses incurred at the appellate court level in litigation against the government."  S & H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Comm'n, 672 F.2d 426, 427 (5th Cir. 1982) (Unit B).  This provision, codified at 28 U.S.C. § 2412(d)(1)(A), provides in relevant part as follows:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

Id.

4

The second provision allows a court to award fees and expenses incurred at the agency level. See S & H Riggers & Erectors, 672 F.2d at 427. This provision, codified at 28 U.S.C. § 2412(d)(3), provides in relevant part as follows:

> In awarding fees and other expenses under this subsection to a prevailing party in any action for judicial review of an adversary adjudication, as defined in [5 U.S.C. § 504(b)(1)(C)][2] . . . the court shall include in that award fees and other expenses to the same extent authorized in subsection (a) of such section, unless the court finds that during such adversary adjudication the position of the United States was substantially justified, or that special circumstances make an award unjust.

Id. Section 504(a), which is referenced in the above-quoted statute, contains a provision "substantially identical" to Section 2412(d)(1)(A). See S & H Riggers & Erectors, 672 F.2d at 428. It provides as follows:

> An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust. Whether or not the position of the agency was substantially justified shall be determined on the basis of the administrative record, as a whole, which is made in the adversary adjudication for which fees and other expenses are sought.

---

[2] This section defines an "adversary adjudication" as "an adjudication under section 554" of the Administrative Procedure Act "in which the position of the United States is represented by counsel." 5 U.S.C. § 504(b)(1)(C). The FTC does not challenge LabMD's assertion that the Enforcement Action was an adversary adjudication under that definition.

5

5 U.S.C. § 504(a)(1).

In sum, a party "seeking an award for fees incurred in either a civil action or an adversary agency adjudication is entitled to fees provided that (1) it is the prevailing party; (2) its application for fees is timely; (3) the position of the government was not substantially justified; and (4) no special circumstances make an award unjust." Pollgreen v. Morris, 911 F.2d 527, 532 (11th Cir. 1990). LabMD submits that it timely filed its Petition (see 28 U.S.C. § 2412(d)(1)(B)), and that it is eligible for a fee award because it meets the net worth and employee limits of the EAJA (id. § 2412(d)(2)(B)).  (See Pet'r's Corr. Appl. 12-13.)  The FTC does not challenge these submissions.  The FTC also does not argue that any "special circumstances" exist here that could deny fees and expenses to LabMD.

The Court must first determine whether LabMD was the prevailing party. The FTC made that determination simple, as it concedes that LabMD was the prevailing party before the Eleventh Circuit.  (See FTC's Opp'n Br. 14 ("LabMD is a prevailing party under this standard because the Court vacated the Commission's remedial order.").)  This concession should end the inquiry.

Nevertheless, the FTC hedges on that concession by asserting that LabMD's only prevailed to a "small degree" (FTC's Opp'n Br. 14), or that LabMD only achieved "limited success" because, while the Eleventh Circuit

vacated the FTC's cease and desist order, it did not reverse the agency's finding

that LabMD had violated the FTC Act.  (FTC's Suppl. Br. [13], at 5 & n.4.)[3]  It

then argues that LabMD should receive no attorney's fees or expenses for any

work before the agency because it lost there.  (Id. at 5; see also FTC's Opp'n Br.

12.)  This argument is not well taken.

> The single finding that the Government's position lacks substantial
> justification, like the determination that a claimant is a "prevailing
> party," thus operates as a one-time threshold for fee eligibility.  In
> EAJA cases, the court first must determine if the applicant is a
> "prevailing party" by evaluating the degree of success obtained.

Jean, 496 U.S. at 160.  Although LabMD had no success before the agency, the

degree of success it ultimately obtained on its appeal of the agency's actions to

the Eleventh Circuit was complete, because that court vacated the FTC's cease

and desist order.  See LabMD, Inc. v. FTC, 894 F.3d 1221.  The FTC's citation to

---

[3] The Eleventh Circuit vacated the FTC's cease and desist order as
unenforceable, and before doing so, "assum[ed] arguendo that the Commission is
correct and that LabMD's negligent failure to design and maintain a reasonable
data-security program invaded consumers' right of privacy and thus constituted
an unfair act or practice."  LabMD, Inc. v. FTC, 894 F.3d 1221, 1231 (11th Cir.
2018).  Although the FTC sees this as a victory (FTC's Opp'n Br. 8), the Court
fails to see how when the Circuit had already issued a stay of the order it
ultimately vacated because it found "compelling reasons why the FTC's
interpretation [of the FTC Act] may not be reasonable."  LabMD, Inc. v. FTC,
678 F. App'x 816, 820 (11th Cir. 2016).  In any event, as the FTC is well aware,
"arguendo" is Latin, meaning "for the sake of argument."  Black's Law
Dictionary, 9th ed.  The Circuit did not find that the FTC's position was correct.

7

<u>Villano v. City of Boynton Beach</u>, 254 F.3d 1302 (11th Cir. 2001), is inapposite. (FTC's Suppl. Br. 5.)  This case noted that, where a plaintiff achieved only partial or limited success in a suit against the government, an attorney's fee award which was the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate might be excessive.  As addressed <u>infra</u>, LabMD was not a plaintiff who only obtained limited success against the government.  LabMD was a defendant who obtained complete success defending itself from the government.

Thus, the undersigned reports that LabMD met the one-time threshold for fee eligibility as the prevailing party.  Given that LabMD was the prevailing party, the undersigned reports <u>infra</u> Part II.A. that the FTC's position was not substantially justified, and recommends <u>infra</u> Part II.B. that LabMD be awarded reasonable attorney's fees and expenses.

### A.    <u>Substantial Justification</u>

#### 1.    <u>Governing Principles</u>

As noted above, a court shall award attorney's fees to a prevailing party under the EAJA "unless the position taken by the United States in the proceeding at issue 'was substantially justified.'"  <u>Sullivan</u>, 490 U.S. at 883 (quoting 28 U.S.C. § 2412(d)(1)(A)).  "The burden of proving substantial justification falls to the Government."  <u>Davidson v. Veneman</u>, 317 F.3d 503, 506 (5th Cir. 2003).  A

8

government entity's position is substantially justified under section 2412(d) if it is "justified in substance or in the main–that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988); see also United States v. Jones, 125 F.3d 1418, 1425 (11th Cir. 1997) ("The government's position is substantially justified under the EAJA when it is justified to a degree that would satisfy a reasonable person–i.e., when it has a reasonable basis in both law and fact.").

The government's position is considered as a whole, including both the underlying administrative action and any appeal. See Jean, 496 U.S. at 161-62. In Myers v. Sullivan, 916 F.2d 659 (11th Cir. 1990), the Eleventh Circuit interpreted Jean as holding that, if "the district court concludes that the government's positions were 'substantially justified'–i.e., all of the government's arguments possessed a 'reasonable basis both in law and fact,'–then, notwithstanding the fact that the claimant ultimately prevailed in the litigation, the claimant is not entitled to receive attorney's fees." Id. at 666-67 (footnotes and citations omitted). A loss on the merits does not render the government's position not substantially justified. See White v. United States, 740 F.2d 836, 839 (11th Cir. 1984). According to the Eleventh Circuit,

> [a]n examination of whether the government's position was substantially justified encompasses an evaluation of both the

9

agency's prelitigation conduct and the subsequent litigation positions of the Justice Department.  Under this inquiry, it is not sufficient for the government to show that some of its earlier positions or arguments were valid.  Unless the government can establish that all of its positions were substantially justified, the claimant is entitled to receive attorney's fees.

Myers, 916 F.2d at 667 n.5 (citation omitted).

The Eleventh Circuit has identified a non-exhaustive list of six factors whose consideration may aid a district court's assessment of the government's position:  (1) the point at which the litigation was resolved; (2) views expressed by other courts on the merits; (3) the legal merits of the government's position; (4) the clarity of the governing law; (5) the foreseeable length and complexity of the litigation; and (6) the consistency of the government's position.  See Jean v. Nelson, 863 F.2d 759, 767 (11th Cir. 1988), aff'd sub nom. Comm'r, I.N.S. v. Jean, 496 U.S. 154 (1990).

## 2.    The Parties' Arguments

The FTC asserts that its position was substantially justified because it had an undisputed factual basis to investigate LabMD and approve a complaint against it.  The FTC asserts that LabMD left the personal medical information of more than 9,000 consumers exposed to millions of users on a peer-to-peer network, from which it was downloaded at least once.  (FTC's Opp'n Br. 17.)  As explained by the Eleventh Circuit, in 2005 LabMD's billing manager downloaded

10

and installed a peer-to-peer file-sharing program called LimeWire on her work computer. LabMD, Inc. v. FTC, 678 F App'x at 818. LimeWire allows other users to search for and download any file that is available for sharing on a computer connected to the file-sharing program and that billing manager designated the "My Documents" folder on her computer as one from which files could be searched and downloaded. Id. At the same time, a file which contained 1,718 pages of sensitive personal information for roughly 9,300 patients, including their names, birthdates, and Social Security numbers (hereafter the "1718 file"), was also in the billing manager's "My Documents" folder that was accessible through LimeWire. Id.

The FTC also contends that it had a reasonable legal basis to allege and ultimately find that LabMD's data security failures caused or were likely to cause substantial injury and thus violated § 5(n) of the FTC Act.[4] (FTC's Opp'n Br.

---

[4] Section 5(n), codified at 15 U.S.C. § 45(n), provides as follows:

The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy

11

17.)  According to the FTC, it has been using § 5 to police corporate data security practices for nearly twenty years, and no court has ever adopted LabMD's theory that the statute does not apply.  The FTC also asserts that it was justified in finding that the exposure of personal data, even without concrete harm, can be an "injury" within the meaning of § 5(n).  The FTC points out that, while this administrative case was pending, the Third Circuit held that "'[a]lthough unfairness claims usually involve actual and completed harms, they may also be brought on the basis of likely rather than actual injury,' and that 'the FTC Act expressly contemplates the possibility that conduct can be unfair before actual injury occurs.'"  (Id. at 17-18, quoting FTC v. Wyndham Worldwide Corp., 799 F.3d 236, 246 (3d Cir. 2014).)  The FTC asserts that LabMD raised essentially the same claims before the Eleventh Circuit, but the panel assumed that the Commission's approach was lawful.  (Id. at 18.)

The FTC further argues that it was likewise justified in entering the cease and desist order that required LabMD to establish and maintain a reasonable data security program.  (FTC's Opp'n Br. 18.)  The FTC claims that courts have regularly approved injunctions containing the same requirements as the LabMD

---

considerations may not serve as a primary basis for such determination.

12

order.  The FTC further represents that it has entered into more than fifty consent orders that contain the same language as the LabMD order vacated by the Eleventh Circuit.  And the FTC argues that it had no reason to doubt the legality of its requirement that companies establish reasonable data security programs because it had successfully enforced violations of the very same requirement.  (Id. at 19, citing inter alia, two stipulated judgments and orders in United States v. Choicepoint, No. 1:06-CV-0198-JTC (N.D. Ga.).)  For all the same reasons, the FTC argues that its position in the appeal was substantially justified.  (FTC's Opp'n Br. 19.)

LabMD has a diametrically opposing view.  It argues that the FTC's investigation was fueled by Tiversa's fraudulent claims (which the FTC does not deny), and that the FTC's prosecution was based on Tiversa's false testimony and fabricated documents (which again the FTC does not deny).  (Pet'r's Reply Br. 4.)  During oral argument before the Eleventh Circuit on July 3, 2017, Judge Tjoflat even commented on the impropriety of the FTC's relationship with Tiversa:  "[T]he aroma that comes out of the investigation of this case is that Tiversa was shaking down private industry with the help of the FTC."  (Id. (quoting audio recording).)  LabMD asserts that the FTC does nothing in its Opposition Brief to make that aroma a fragrant one.

13

Judge Tjoflat also expressed his view at oral argument that the FTC should have dismissed its case after Tiversa's lies were exposed–"it should have become obvious after you–after the evidence collapsed and your–and Complaint Counsel couldn't go any further."  (Pet'r's Reply Br. 4-5 (quoting audio recording).) LabMD argues that it would have been obvious to any reasonable person that Complaint Counsel should go no further, but they did so anyway.  (Id. at 5.) After the frauds were exposed, the FTC had no evidence of actual or likely substantial consumer injury.  Instead of dismissing the complaint, Complaint Counsel adopted a new theory of prosecution, arguing that LabMD had violated § 5(n) of the FTC Act by causing "hypothetical" or "theoretical" harm to consumers.  (Id.)  But, in response to this new theory, the ALJ found that "'fundamental fairness dictates that demonstrating actual or likely substantial consumer injury under § 5(n) requires proof of more than the hypothetical or theoretical harm that has been submitted by the government in this case.'"  (Id. (quoting ALJ's opinion).)

LabMD asserts that the FTC did not stop there, but instead aggravated and compounded its already unreasonable conduct by vacating the ALJ's decision, and entering what the Eleventh Circuit subsequently found to be an insufficiently specific and thus unenforceable cease and desist order.  See LabMD, Inc. v. FTC,

14

894 F.3d at 1221.   Moreover, when LabMD sought a stay of that order at the Eleventh Circuit during the pendency of its appeal, the FTC pursued what LabMD calls its unprecedented interpretation of consumer injury.  (Pet'r's Reply Br. 5.)  In a decision that should have telegraphed to the FTC that its position was unreasonable, the Eleventh Circuit granted a stay.  See LabMD, Inc. v. FTC, 678 F. App'x at 816.  Although the Circuit noted that the FTC's interpretation of the injury requirement of 15 U.S.C. § 45(n) was entitled to Chevron deference if reasonable, it agreed with LabMD that there were compelling reasons why the FTC's interpretation was not.  Id. at 820.

First, the Circuit found that it was not clear that a reasonable interpretation of § 45(n) included intangible harms as found by the FTC.  Indeed, the Circuit held that the FTC's interpretation was in conflict with its own 1980 Policy Statement on Unfairness.  LabMD, Inc. v. FTC, 678 F. App'x at 820-21.[5]  Second,

_____

[5] The Eleventh Circuit made the following observation:

That Policy Statement notably provided that the FTC "is not concerned with . . . merely speculative harms," but that "[i]n most cases a substantial injury involves monetary harm" or "[u]nwarranted health and safety risks." . . . "Emotional impact and other more subjective types of harm, on the other hand, will not ordinarily make a practice unfair."

LabMD, Inc. v. FTC, 678 F. App'x at 820 (quoting FTC, Policy Statement on Unfairness (Dec. 17, 1980), https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness).

the Circuit stated that "it is not clear that the FTC reasonably interpreted 'likely to cause' as that term is used in § 45(n)." Id. at 821. "[W]e do not read the word 'likely' to include something that has a low likelihood. We do not believe an interpretation that does this is reasonable." Id. (See Pet'r's Reply Br. 6.)

Finally, LabMD argues that the FTC's assertion that its interpretation that injury includes intangible harm is supported by the Wyndham decision is inaccurate. (Pet'r's Reply Br. 6.) According to LabMD, the Third Circuit in Wyndham simply observed that "the FTC Act expressly contemplates the possibility that conduct can be unfair before actual injury occurs." 15 U.S.C. § 45(n) ("[An unfair act or practice] causes or is *likely to cause* substantial injury" (emphasis added))." 799 F.3d at 246. According to LabMD, the Wyndham court said nothing about intangible, hypothetical or theoretical harm. Indeed, LabMD contends that neither Wyndham nor any other case provides legal support for the FTC's unfounded position that intangible, hypothetical or theoretical injury satisfies the consumer injury requirement in 15 U.S.C. § 45(n). (Pet'r's Reply Br. 6.) In sum, LabMD argues that the FTC's pre-litigation position, its original litigation position, and the revised position it took at trial and on appeal after its fraudulent evidence was exposed were all unreasonable and no reasonable person could think otherwise. (Id. at 7.)

16

### 3.    Special Master's Report

The undersigned reports that the position taken by the FTC here was not substantially justified.  Indeed, the lack of substantial justification for the FTC's prosecution of LabMD goes back to the very beginning of this matter and arose from the inappropriate relationship between Tiversa and the FTC and its unquestioning reliance on what turned out to be false assertions by Tiversa.[6]

As explained by the Eleventh Circuit, Tiversa employs forensic analysts to search peer-to-peer networks specifically for files that are likely to contain sensitive personal information in an effort to "monetize" those files through targeted sales of Tiversa's data security services to companies it can infiltrate. LabMD, Inc., v. FTC, 678 F App'x at 818.  The record shows that Tiversa infiltrated LabMD's network in 2008, copied the 1718 File (which LabMD calls "theft"), notified LabMD that it had a copy of the 1718 File, and repeatedly asked LabMD to buy its breach detection services, falsely claiming that copies of it were being searched for and downloaded on peer-to-peer networks.  Id.  LabMD

---

[6] Tiversa's CEO and the FTC testified at a congressional hearing on peer-to-peer file-sharing technology in 2007.  LabMD, Inc. v. FTC, 894 F.3d at 1225 n.7.  Two months thereafter, Tiversa and the FTC began their relationship after the FTC asked Tiversa to provide it with information regarding companies' data security practices.  Id.

rejected Tiversa's overtures and removed LimeWire from the billing manager's computer. LabMD, Inc. v. FTC, 894 F.3d at 1224-25.

After LabMD declined to purchase Tiversa's services, Tiversa informed the FTC in 2009 that LabMD and other companies had been subject to data breaches involving its customers' personal information. LabMD, Inc., v. FTC, 678 F App'x at 818. "Tiversa's CEO instructed one of his employees to 'make sure [LabMD is] at the top of the list' of companies that had suffered a security breach that was given to the FTC." Id. As noted by the Circuit, Tiversa did not include any of its clients on the list. Id. Tiversa hoped that the FTC would contact the companies on its list so they would feel pressured to purchase Tiversa's services out of fear of an FTC enforcement action. Id.

Tiversa also arranged for the delivery of the 1718 File to the FTC in 2009. LabMD, Inc. v. FTC, 894 F.3d at 1225. It did so through a shell company that Tiversa created to avoid the implication that it was the source. LabMD, Inc. v. FTC, 894 F.3d at 1225 n.7. LabMD shows that the FTC's relationship with Tiversa came to the attention of the Committee on Oversight and Government Reform of the U.S. House of Representatives, whose staff investigated and, on January 2, 2015, published a Report which found that "'it is clear that Tiversa and the FTC had a mutually beneficial relationship. The FTC used Tiversa as the

18

source of convenient information used to initiate enforcement actions, and Tiversa used the FTC to [sic] in further pursuing the company's coercive business practices.'" (See Pet'r's Corr. Appl. 5-6, quoting Ex. J to LabMD's Oct. 7, 2016 Motion, at 67.) "'The FTC accepted information from Tiversa through a shell organization without questioning the motives or reason for the third party, or, significantly, the veracity of the underlying information.'" (Id. at 6, quoting Ex. J at 54.) During oral argument in this case, Judge Tjoflat commented on the impropriety of the FTC's relationship with Tiversa, stating: "[T]he aroma that comes out of the investigation of this case is that Tiversa was shaking down private industry with the help of the FTC." (Pet'r's Reply Br. 4 (quoting audio recording).)

As a result of the information provided by Tiversa, the FTC launched an investigation into LabMD's data security practices in 2010. LabMD, Inc., v. FTC, 678 F App'x at 818. Over the dissent of one commissioner,[7] the FTC relied on

_____

[7] As relayed by LabMD, FTC Commissioner Rosch warned in 2012 that "'Tiversa is more than an ordinary witness, informant, or "whistle-blower." It is a commercial entity that has a financial interest in intentionally exposing and capturing sensitive files on computer networks, and a business model of offering its services to help organizations protect against similar infiltrations." (Pet'r's Corr. Appl. 6-7 (filed 10/24/18), quoting Doc. 326, 6-7.) Commissioner Rosch advised that, under these circumstances, the FTC staff should not inquire about the 1718 File, and should not rely on Tiversa for evidence or information, in order to avoid the appearance of impropriety. (Id.) In his November 13, 2015 Initial

19

the information provided by Tiversa, including the false assertion that at least four different Internet Protocol addresses had downloaded the 1718 file from peer-to-peer networks.  Id.  The FTC voted to issue a complaint against LabMD in 2013. Id.  The FTC alleged that LabMD failed to provide reasonable and appropriate security for its customers' personal information and that this failure caused (or was likely to cause) substantial consumer injury, constituting an unfair act in violation of the FTC Act.  Id.

This complaint resulted in an ALJ holding an evidentiary hearing beginning in May 2014, which concluded in July 2015.  LabMD, Inc., v. FTC, 678 F App'x at 818.  LabMD shows that during this hearing the FTC relied heavily on Tiversa's fabricated evidence that the 1718 File had spread across the Internet, offering that "evidence" in support of the FTC's core allegation that consumers had or were likely to suffer substantial consumer injury by reason of LabMD's supposedly lax data security practices in regard to the 1718 File. (Pet'r's Corr. Appl. 7, citing Doc. 326, 60.[8])

---

Decision, the FTC's Administrative Law Judge ("ALJ") observed, "'FTC Staff did not heed then-Commissioner Rosch's warning, and also did not follow his advice.  Instead, Complaint Counsel chose to further commit to and increase its reliance on Tiversa.'"  (Id. at 7 n.4, quoting Doc. 326, 7.)

[8] All citations to "Doc. #" refer to entries in the Circuit court record.

When Tiversa's fabrication of evidence showing the purported "spread" of the 1718 File was revealed by a whistleblower at trial before the ALJ, the FTC withdrew that "evidence" (Pet'r's Corr. Appl. 7-8, citing Doc. 326, 10), never produced any non-fabricated evidence that the 1718 File had ever been seen by anyone other than Tiversa or had otherwise "spread" across the Internet (id. at 8, citing Doc. 326, 10-11, 32-33, 159), and changed its theory of the case and proceeded against LabMD using what the Eleventh Circuit would eventually find to be an unreasonable interpretation of Section 5 of the FTC Act, because it ran counter to its plain language and the FTC's own longstanding written interpretations of that Section.  LabMD v. FTC, 678 F. App'x at 820-21.

After hearing the parties' evidence, the ALJ dismissed the complaint, finding a failure of proof that LabMD's computer data security practices "caused" or were "likely to cause" substantial consumer injury.  LabMD v. FTC, 678 F. App'x at 819.[9]  The ALJ found that because there was no proof anyone other than Tiversa had downloaded the 1718 file, it was unlikely that the information in that

---

[9] The amount of work that went into the administrative proceeding is staggering.  As noted by the ALJ, "Over 1,080 exhibits were admitted into evidence, 39 witnesses testified, either live or by deposition, and there [were] 1,504 pages of trial transcript.  The parties' proposed findings of fact and conclusions of law, post-trial briefs, replies to proposed findings of fact and conclusions of law, and reply briefs total 2,066 pages." (Pet'r's Corr. Appl.  9 n.5, quoting Doc. 326, 5.)

21

file was the source of any harm now or would be in the future. The ALJ also rejected the argument that a hypothetical risk of future harm was a sufficient basis for holding that the breach was likely to cause future harm. Id. The ALJ also found that "Tiversa's representations and its communications with LabMD that the 1718 file was being searched for on peer-to-peer networks, and that the 1718 file had spread across peer-to-peer networks, were not true." LabMD, Inc. v. FTC, 894 F.3d at 1225 n.6 (quoting ALJ's opinion).

Judge Tjoflat expressed his view at oral argument that the FTC should have dismissed its case after Tiversa's lies were exposed–"it should have become obvious after you–after the evidence collapsed and your–and Complaint Counsel couldn't go any further." (Pet'r's Reply Br. 4-5 (quoting audio recording).) FTC's counsel conceded to Judge Tjoflat that "'[t]here's no question that Tiversa engaged in serious, serious misconduct in connection with this.'" (Pet'r's Corr. Appl. 5 n.3 (quoting audio recording of oral argument).)

However, it seems that Tiversa was not the only one engaged in unreasonable conduct. Despite the collapse of the FTC's case at trial, Complaint Counsel continued to pursue LabMD, appealing the ALJ's decision to the FTC. LabMD, Inc., v. FTC, 678 F App'x at 819. The FTC agreed with the ALJ's finding that Tiversa's assertion that it "had gathered evidence showing that the

22

1718 file had spread to multiple Internet locations by means of LimeWire was false[.]"  (Pet'r's Reply Br. 4 n.2.)[10]  Nevertheless, the FTC reversed the ALJ in July 2016, holding that he had applied the wrong standard in deciding whether LabMD's data security practices were unreasonable and therefore constituted an unfair act in violation of the FTC Act.  LabMD, Inc., v. FTC, 678 F App'x at 819. The FTC vacated the ALJ's ruling and issued a Final Order requiring LabMD to implement a number of compliance measures, including creating a comprehensive information security program; undergoing professional routine assessments of that program; providing notice to any possible affected individual and health insurance company; and setting up a toll-free hotline for any affected individual to call.  Id.

Tragically, as this case was proceeding through the Enforcement Action stage, LabMD was forced to cease operations.  As noted by the Circuit,

> LabMD says its business could not bear the costs imposed by the FTC investigation and litigation, so it had to close.  LabMD has essentially no assets, no revenue, and does not plan to resume business in the future.  It obtained counsel pro bono because it could not afford to pay a lawyer.  LabMD now has no employees, and keeps only the records required by law in a secured room, on an unplugged computer that is not connected to the Internet.  LabMD

---

[10] As it turned out, the only entities who ever saw the 1718 file were LabMD, Tiversa, the FTC, and a professor to whom Tiversa sent it.  LabMD, Inc. v. FTC, 894 F.3d at 225 & n.6.

23

has less than $5,000 cash on hand, and is subject to a $1 million judgment for terminating its lease early.

LabMD, Inc. v. FTC, 678 F. App'x at 819.

Looking back at all that has transpired in this case, the FTC's assertion that it had an "undisputed factual basis to investigate LabMD" (FTC's Opp'n Br. 17) rings hollow. The FTC only received information about the 1718 File because LabMD had rejected Tiversa's shakedown attempt. The FTC knew or should have known how Tiversa was getting its leads on companies it was reporting, and should have been suspicious when Tiversa relayed the 1718 File surreptitiously. But, it was not. As the aforementioned Congressional Report observed, the FTC was accepting information from Tiversa without questioning its motives or the veracity of that information. But it should have.

Even if the FTC could be excused for not verifying the facts before issuing a complaint (which it should not be), it became clear during the trial before the ALJ that the Tiversa's assertions about the spread of the 1718 File were lies. Instead of dismissing the case, which is what Judge Tjoflat said should have happened, the FTC kept going after LabMD. Despite admitting that Tiversa's claims were false, the FTC came up with a new theory that the Eleventh Circuit subsequently found to be an unreasonable application of § 5(n) of the FTC Act, leading it to issue a stay. See LabMD, Inc. v. FTC, 678 F. App'x at 822. This

24

stay belies the FTC's claim that it had a reasonable legal basis to allege and find that LabMD's data security measures were likely to cause substantial injury. But, the FTC still continued to litigate, and eventually lost on the merits given its unenforceable cease and desist order. The FTC's misplaced reliance on Tiversa and ultimately unenforceable cease and desist order demonstrates the FTC lacked an "undisputed" factual basis to substantially justify its position.

The FTC's other arguments similarly fail. The FTC asserts that it was substantially justified in issuing the cease and desist order here because it has used the same language in fifty consent orders without any problems, two of which were filed in this Court. (FTC's Opp'n Br. 18-19.) However, the FTC fails to show that those cases were litigated and that a court ruled on the legality of the requirements imposed by the consent orders. Indeed, the title of these orders, i.e., "consent orders," is telling. Entry of such orders, which are submitted jointly by the parties with the request that they be approved, should not have given the FTC confidence that either its legal position or the terms it was imposing on companies were reasonable. Instead, it is reasonable to assume that the private parties to these consent orders signed them to avoid the type of long and protracted legal battle that played out here. The FTC encountered in LabMD

25

an opponent who was not buying what the FTC was selling.  In response, the FTC crushed LabMD.

Finally, the Court agrees with LabMD that the FTC's reliance on the Wyndham decision is misplaced.  The Third Circuit in Wyndham simply observed that the FTC Act contemplates the possibility that conduct can be unfair before actual injury occurs.  See 15 U.S.C. § 45(n) (quoted supra note 4.) Wyndham said nothing about intangible, hypothetical or theoretical harm violating Section 45(n).

With regard to the six factors the Eleventh Circuit directed in Jean may apply in determining whether the government's position was substantially justified, 863 F.2d at 767, the undersigned reports as follows:

Factor (1), the point at which the litigation was resolved.  The case was resolved in the Eleventh Circuit in 2018 after approximately eight years of investigation and litigation.

Factor (2), views expressed by other courts on the merits.[11]  The only court to have expressed a view on the merits of this case is the Eleventh Circuit.  It did

---

[11] A court must be cautious in applying this factor.  As the Supreme Court stated in Pierce, "the fact that one other court agreed or disagreed with the Government does not establish whether its position was substantially justified. Conceivably, the Government could take a position that is not substantially

so in two opinions. One granted a stay of the FTC's cease and desist order because it agreed that LabMD had made a strong showing that the FTC's factual findings and legal interpretations may not be reasonable. LabMD, Inc. v. FTC, 678 F. App'x at 821. In the other, the Circuit vacated the FTC's order because it was unenforceable. LabMD, Inc. v. FTC, 894 F.3d at 1237.

Factor (3), the legal merits of the government's position. As discussed supra, the ALJ and the Eleventh Circuit found no merit in the FTC's position.

Factor (4), the clarity of the governing law. The Eleventh Circuit agreed with LabMD that the FTC's reading of § 45(n) was in conflict with the agency's long-standing Policy Statement on Unfairness. See LabMD, Inc. v. FTC, 678 F. App'x at 820. Although not highlighted by LabMD in its Reply Brief, the Circuit also noted that the FTC's order relied upon the legislative history of § 45(n). But the Senate Report upon which the FTC relied says that "'[e]motional impact and more subjective types of harm alone are not intended to make an injury unfair.'" Id. (quoting S. Rep. No. 103-130, 1993 WL 322671, at *13 (1993)). Further, the Circuit agreed with LabMD's contention that "what the FTC here found to be harm is not even intangible, as a true data breach of personal information to the

---

justified, yet win; even more likely, it could take a position that is substantially justified, yet lose." 487 U.S. at 569.

public might be, but rather is purely conceptual because this harm is only speculative." Id. at 820-21 (internal quotation marks deleted). In sum, the extant law was against the FTC's position.

Factor (5), the foreseeable length and complexity of the litigation.[12] This factor is difficult to apply because, at the inception of a case, no one can anticipate how long it will last or how complex it may become. The FTC may have assumed that LabMD, as many other companies apparently have done given the consent orders it referenced, would roll over and sign whatever the FTC put before it. Had LabMD done so, this case would have been over quickly. But that is not what happened. Given that LabMD was willing to fight, the FTC had an obligation here to show that its persistence in the litigation was justified. See supra note 12. It has failed to do so.

Factor (6), the consistency of the government's position. The FTC has not been consistent. It started with one theory, i.e., that LabMD failed to provide reasonable and appropriate security for its customers' personal information and that this failure caused (or was likely to cause) substantial consumer injury,

---

[12] "[I]n categories of cases in which substantial investments of effort and money commonly are required to prosecute suits to their ultimate conclusions, the government should be obliged to make an especially strong showing that its persistence in litigation was justified." Spencer v. N.L.R.B., 712 F.2d 539, 560 (D.C. Cir. 1983).

constituting an unfair act in violation of the FTC Act.  See LabMD, Inc. v. FTC, 678 F. App'x at 818.  However, once Tiversa's fabrications came to light, and there was no proof that anyone other than Tiversa had downloaded the 1718 File, FTC adopted a new theory that did not rely on any tangible harm to any consumer.  Instead, the FTC found actual harm due to the sole fact of the 1718 File's unauthorized disclosure.  Id. at 820.  The FTC also found that consumers suffered a "privacy harm" that may have affected their reputations or emotions, which therefore constituted a substantial injury.  Alternatively, the FTC found that the unauthorized exposure of the 1718 File was likely to cause substantial injury.  Id.  Such inconsistency undermines the Government's claim that its position was substantially justified.

Of course, the Jean factors are non-exhaustive.  Given the evidence here, an additional factor that must be considered in deciding whether the FTC's position was substantially justified is its inappropriate relationship with Tiversa.  As exhaustively cataloged above, the FTC acted as the hammer to Tiversa's anvil.  A government agency should not weld its significant power and resources to aid a private company's shakedown racket.  Thus, the Jean factors and the FTC's inappropriate relationship with Tiversa show that the FTC lacked substantial justification in its position.

29

For all the above reasons, the undersigned reports that the FTC's position in this case was not substantially justified, thus entitling LabMD to an award of reasonable attorney's fees and expenses.

### B.    LabMD's Petition for Attorney's Fees and Expenses

Given the FTC's concession that LabMD was the prevailing party, and given the above report that the FTC's position was not substantially justified, LabMD is entitled to an award of reasonable attorney's fees and expenses. Before making a recommendation on attorney's fees and expenses (see infra Part II.B.(5)), the Court addresses four topics which have an impact on that recommendation:  (1) collateral actions, (2) hourly rates, (3) reasonable hours and expenses, and (4) the proper components of a fee application.

### 1.    Collateral Actions

The FTC contends that LabMD is seeking hundreds of thousands of dollars in fees and expenses for "collateral" actions.  Specifically, the FTC argues that the Court should reject LabMD's claim to the extent it seeks fees and expenses that were incurred neither in the Enforcement Action nor its 2016 appeal, but in the following unsuccessful lawsuits brought by LabMD:

(1)    LabMD's Petition for Review filed in the Eleventh Circuit on November 16, 2013, see LabMD v. FTC, No. 13-15267;

30

(2) LabMD's November 14, 2013 Complaint filed in the District of Columbia against the FTC and its Commissioners, see LabMD v. FTC, No. 1:13-CV-01787 (D.D.C.); and

(3) LabMD's March 20, 2014 Complaint filed in the Northern District of Georgia, see LabMD v. FTC, No. 1:14-CV-810-WSD (N.D. Ga.), and its appeal of that dismissal, see LabMD v. FTC, 776 F.3d 1275 (11th Cir. 2015).

(See FTC Opp'n Br. 9-10, 20.)

The FTC also included in its list of collateral actions a 2015 Bivens action filed in the District of Columbia. (FTC's Opp'n Br. 10 (citing Daugherty v. Sheer, 248 F. Supp. 3d 272 (D.D.C. 2017), rev'd, 891 F.3d 386 (D.C. Cir. 2018).) LabMD asserts that it seeks no fees and expenses here for that Bivens action. (Pet'r's Reply Br. 14.) The FTC did not challenge that assertion in its Supplemental Brief.

The FTC also asserts that LabMD filed several other collateral lawsuits against Tiversa (which resulted in three appeals and a petition for certiorari).[13] The FTC claims that LabMD's initial Petition was not sufficiently detailed to

_____

[13] See LabMD v. Tiversa, No. 1:11-CV-04044-JOF (N.D. Ga.) (appealed to 11th Cir. in No. 12-14504 ), and LabMD v. Tiversa, No. 1:11-CV-04044-LMM (N.D. Ga.) (appealed to 11th Cir. in No. 17-11274), cert. denied, 139 S. Ct. 490 (Nov. 13, 2018); Daugherty v. Adams, No. 1:16-CV-02480-LMM (N.D. Ga., filed July 8, 2016) (appealed to 11th Cir. in No. 17-1130); LabMD v. Tiversa, Nos. 2:15-CV-92 and 2:17-CV-1365 (W.D. Pa.); LabMD v. Bryan Cave, No. 1:18-CV-3790 (S.D.N.Y., filed 4/28/18); and U.S. ex rel Daugherty v. Tiversa, No. 1:14-CV-4548 (S.D.N.Y., filed 6/24/14). (See FTC Opp'n Br. 10-11 n.5.)

determine how many hours of legal work on these Tiversa cases were included therein. (See FTC Opp'n Br. 11 n.5.) LabMD responds that it seeks no fees or expenses for any of those Tiversa-related actions. (Pet'r's Reply Br. 14.) The FTC disputes that assertion in part. (FTC's Supp. Br. 6-7.)

LabMD argues that these action were not collateral. As the FTC aggressively pursued its charges, LabMD asserts that it had to defend itself aggressively. LabMD contends that it cannot be faulted for filing other actions that attempted to halt the FTC's pursuit of its unreasonable claims. LabMD asserts that these cases, especially the 2013 Petition for Review in the Eleventh Circuit, the 2013 Complaint in the District Court for the District of Columbia, and the 2014 action in this Court with a subsequent appeal to the Eleventh Circuit, were part and parcel of LabMD's defense. Petitioner contends that whether it succeeded in any of those cases is as irrelevant as whether it succeeded on any particular ground on this appeal. (Pet'r's Reply Br. 13-14.)

The FTC has the better argument here, given Lundin v. Meachum, 980 F.2d 1450 (D.C. Cir. 1993). In Lundin, six federal bankruptcy judges sued the Director of the Administrative Office of the United States Courts challenging his declaration that the Bankruptcy Amendments and Federal Judgeship Act of 1984 violated the Constitution's Appointments Clause. Id. at 1452. Over four years

later, in 1988, the case was dismissed as moot, but in the interim, other parties had filed cases in other federal courts involving the same or related issues. Id. The Lundin plaintiffs intervened or filed amicus briefs in the other lawsuits. Id. at 1452-53. They sought EAJA fees both for the Lundin primary suit and the other cases litigated by their counsel. Id. On appeal, the D.C. Circuit held that the plaintiffs were entitled to fees only in their primary case and not in the related cases. Id. at 1453. The court held that the statute forbids the award of fees in actions over which the court lacks jurisdiction. Id. at 1461 (citing 28 U.S.C. § 2412(d)(1)(A)). The court rejected the plaintiffs' argument that the cases were a single litigation unit. Id. at 1462. It concluded that the district court

> did not have jurisdiction over the related cases; those cases were neither an essential step in connection with, nor in any way controlling in the prosecution of, the suit below. This court cannot, therefore, award recovery under the EAJA for fees incurred in the related cases. Although we agree that the cases were related to the present case in terms of the legal issues presented, that is not equivalent to holding that they were necessary to the vindication of the Six Judges' claims.

Id. at 1463; see also Castaneda-Castillo v. Holder, 723 F.3d 48, 72 (1st Cir. 2013) ("It follows that, '[i]n order for a court to award fees under the EAJA, it must have jurisdiction over the underlying action.'") (quoting Zambrano v. I.N.S., 282 F.3d 1145, 1149-50 (9th Cir. 2002)); In re Prod. Steel, Inc., 55 F.3d 1232, 1234 (6th Cir. 1995) ("The requirement in section 2412(d)(1)(B) that plaintiffs apply

33

for attorney fees "within thirty days of final judgment in the action" demonstrates that plaintiffs' status as prevailing parties must be evaluated with respect to the action for which they are seeking fees."); New Hampshire Hosp. Ass'n v. Azar, No. 15-CV-460-LM, 2019 WL 1406631, at *13 (D.N.H. Mar. 28, 2019) ("To the extent NHHA seeks to recover fees associated with any case outside of this court's jurisdiction, that request is denied.").[14]

Because none of the aforementioned collateral actions are presently before the Eleventh Circuit, LabMD was not a prevailing party in any of them, and any claim now for attorney's fees and expenses in those collateral actions would be untimely in any event,[15] the undersigned recommends that no attorney's fees or expenses be awarded to LabMD for any of the aforementioned collateral actions.

---

[14] LabMD contends that this Court and the Eleventh Circuit once had jurisdiction over some of those collateral actions. (Pet'r's Suppl. Br. 9.) While that is true, the cases filed in this Court and appealed to the Eleventh Circuit have long been concluded. Petitioner's citation to Sullivan, 490 U.S. 877, is unavailing. (Pet'r's Suppl. Br. 10.) There the Court deemed judicial proceedings and court-ordered administrative proceedings following remand of that case "intimately connected," thus allowing an EAJA award for the attorney's time on the administrative proceeding. Id. at 892. While the collateral actions may have raised issues similar to those raised here, they were separate actions.

[15] See 28 U.S.C. § 2412(d)(1)(B) ("A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses…."). The thirty day filing requirement is jurisdictional and cannot be waived. United States v. J.H.T., Inc., 872 F.2d 373, 375 (11th Cir. 1989).

34

Because Kilpatrick Townsend's time was spent on the unsuccessful 2014 lawsuit that LabMD filed in this Court, which was appealed unsuccessfully to the Eleventh Circuit in 2015, the undersigned recommends that no fees or expenses be awarded to LabMD for work performed by Kilpatrick Townsend.

With regard to the invoices that LabMD submitted from Katten Muchin, that firm did not participate in any of the collateral actions. However, the invoices that LabMD submitted for this firm show that its time was spent lobbying for LabMD in Washington, D.C. This type of work was just as unconnected to the instant case as the collateral actions. Moreover, these fees and expenses were not incurred in an agency proceedings or a civil action. See 28 U.S.C. § 2412(d)(1)(A) & 2412(d)(3). Thus, those fees and expenses may not be recovered under the EAJA. Therefore, the undersigned recommends that no fees or expenses be awarded to LabMD for work performed by Katten Muchin.

Some of the firms that billed time on the Enforcement Action or the 2016 appeal to the Eleventh Circuit also billed time for work on the aforementioned collateral actions or provided other legal services unrelated to this matter. The Court will excise time entries for collateral or unrelated actions as it considers each firm's invoices, infra.

### 2. <u>Hourly Rates</u>

Before awarding fees under the EAJA, the Court must determine the appropriate hourly rate and the reasonable number of hours to be compensated. <u>Gates v. Barnhart</u>, 325 F. Supp. 2d 1342, 1344 (M.D. Fla. 2002). With regard to the appropriate hourly rate, a statutory cap of $125.00 per hour for attorney fees exists "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). In determining the appropriate hourly rate, the Court first determines the market rate for similar services provided by lawyers of reasonably comparable skills, experience, and reputation. <u>Meyer v. Sullivan</u>, 958 F.2d 1029, 1033 (11th Cir. 1992). Only if the market rate is greater than the statutory cap, which it is here,[16] does the Court reach the second step of assessing whether it should upwardly

---

[16] The applicant attorney's customary billing rate for fee paying clients ordinarily is the best evidence of his market rate, although that information is not necessarily conclusive. <u>Dillard v. City of Greensboro</u>, 213 F.3d 1347, 1354-55 (11th Cir. 2000) (per curiam). At a minimum, such evidence should be more than the affidavit of the billing attorney, and must speak to rates billed and paid in similar lawsuits. <u>Norman v. Housing Auth. Of City of Montgomery</u>, 836 F.2d 1292, 1299 (11th Cir. 1988). However, the Court is itself an expert on reasonable rates. <u>Id.</u> at 1303. The undersigned reports that the market rate for similar services provided by lawyers of reasonably comparable skills, experience, and reputation exceeds $125 per hour.

36

adjust from the cap to account for an increase in the cost of living or a special factor. Id. at 1033-34. Absent special circumstances, in the event the market rate exceeds the statutory cap, district courts should adjust the fee award to account for an increase in the cost of living. See id. at 1034-35. The consumer price index ("CPI") is typically used to calculate cost-of-living adjustments for attorney's fees under the EAJA. See United States Department of Labor, Bureau of Labor Statistics, *Consumer Price Index*, http://www.bls.gov/cpi/; see also Blackmon v. Colvin, No. 1:14-CV-1012-WSD, 2015 WL 1308374, at *1 (N.D. Ga. Mar. 23, 2015).

According to Petitioner, application of the CPI here yields a maximum cost-of-living adjusted hourly rate of $197.26. (Pet'r's Corr. Appl. 18-19, citing Hawkins Decl. Exs. B-E & H-L.)[17] LabMD seeks up to this maximum cost-of-living adjusted hourly rate of $197.26 for all firms who worked on this matter with the exception of Ropes & Gray, which handled the 2016 appeal to the Eleventh Circuit. For Rope & Gray, LabMD seeks "prevailing market rates" of

---

[17] LabMD seeks less than this adjusted hourly rate for some attorneys, and much less than this rate for paralegals. See Jean, 863 F.2d at 778 (paralegal time is recoverable as part of a prevailing party's award for attorney's fees and expenses to the extent that the paralegal performs work traditionally performed by an attorney).

between $430 and $725 per hour, due to the "distinctive knowledge and specialized skill" of the attorneys at that firm. (Pet'r's Corr. Appl. 17.)

The FTC does not challenge this maximum inflation-adjusted hourly rate of $197.26 for work performed on the appeal. However, the FTC challenges awarding this adjusted hourly rate for work before the agency, because it asserts that rates are capped there at $125 per hour. The FTC also opposes awarding prevailing market rates to Ropes & Gray. (FTC's Opp'n Br. 32.)[18] The Court thus addresses below the appropriate hourly rate for (a) work before the agency and (b) the work of Ropes & Gray.

### a)    **Work Before the Agency**

The FTC first urges the undersigned to award no attorney's fees to LabMD for the work of its counsel before the agency because it lost in that venue. (FTC's Opp'n Br. 21-22.) However, the Court has already rejected that argument because LabMD ultimately was the prevailing party. (See supra pp. 6-8.) In the alternative, the FTC argues that if attorney's fees are awarded, then the hourly

---

[18] LabMD's assertion that the FTC did not challenge its claim that Ropes & Gray attorneys possessed distinctive knowledge and specialized skills so as to be awarded an enhanced fee (Pet'r's Reply Br. 12) is incorrect. The FTC argued that, if fees are awarded for work on the appeal, then Ropes & Gray should not be awarded enhanced fees but rather $125 per hour plus the cost-of-living adjustment. (FTC's Opp'n Br. 32-33 & 33 n.16.)

rate for work before the agency should be capped at $125. (FTC's Opp'n Br. 23 n.11.) The FTC directs the Court to a statutory provision, 5 U.S.C. § 504(b)(1)(A), which requires consideration of two other provisions—5 U.S.C. § 504(a)(1) and 28 U.S.C. § 2412(d)(3). All but one of these provisions was quoted *supra*, but for the reader's convenience, the Court quotes them again. Section 2412(d)(3) provides as follows:

> In awarding fees and other expenses under this subsection to a prevailing party in any action for judicial review of an adversary adjudication, . . . the court shall include in that award fees and other expenses to the same extent authorized in [Section 504(a)], unless the court finds that during such adversary adjudication the position of the United States was substantially justified, or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(3). Section 504(a), referenced above, provides:

> An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust.

5 U.S.C. § 504(a)(1). Finally, Section 504(b)(1)(A) provides as follows:

> (A) "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the agency to be necessary for the preparation of the party's case, and reasonable attorney or agent fees (The amount of fees awarded under this section shall be based upon prevailing market rates for the kind and quality of the services furnished,

except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the agency involved, and (ii) attorney or agent fees shall not be awarded in excess of $125 per hour **unless the agency determines by regulation** that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys or agents for the proceedings involved, justifies a higher fee.)

5 U.S.C. § 504(b)(1)(A) (emphasis added).

The FTC asserts that it has not adopted a regulation as contemplated by the above-quoted statute; therefore, the hourly rate for work before the agency is capped at $125. (FTC's Opp'n Br. 23 n.11.) LabMD did not address the FTC's argument that attorney's fees for work before the agency are capped at $125 per hour. Because LabMD did not challenge the FTC's argument, and the statutory language is clear, the undersigned's will not recommend more than $125 per hour for attorney's fees incurred before the agency. This is the logical result. The Court is simply awarding the same hourly rate to the prevailing party that the agency should have.

### b)    <u>The Work of Ropes & Gray</u>

With regard to the enhanced attorney's fees that LabMD seeks for the work of Ropes & Gray on the appeal, Petitioner relies on the "special factor" provision of Section 2412(d)(2)(A)(ii). As already discussed, this provision of the EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour

40

unless the court determines that an increase in the cost of living or a special factor,

such as the limited availability of qualified attorneys for the proceedings involved,

justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii).

In <u>United States v. Aisenberg</u>, 358 F.3d 1327 (11th Cir. 2004), the

Eleventh Circuit wrote the following about this provision:

> Much of the EAJA case law defines "special factor" in §
> 2412(d)(2)(A)(ii) of the EAJA by what it is not. In <u>Pierce v.
> Underwood</u>, 487 U.S. 552, 573, 108 S. Ct. 2541, 2554, 101 L.Ed.2d
> 490 (1988), the Supreme Court stated that special factors in the
> context of § 2412(d)(2)(A)(ii) do not include "[t]he novelty and
> difficulty of issues, the undesirability of the case, the work and
> ability of counsel, and the results obtained," nor "factors applicable
> to a broad spectrum of litigation" including "the contingent nature of
> the fee." <u>Id.</u> (internal quotation marks omitted). Similarly, in
> <u>Pollgreen v. Morris</u>, 911 F.2d 527, 537 (11th Cir. 1990), this Court
> noted that special factors in the context of § 2412(d)(2)(A)(ii) do not
> include "the motivations of the attorneys in bringing the case, the pro
> bono nature of the case, the fact that the litigation served to
> 'vindicate public rights,' and the hardships experienced by counsel in
> departing from the statutory hourly rate." <u>Id.</u> (citing <u>Jean v. Nelson</u>,
> 863 F.2d 759, 775-76 (11th Cir. 1988)). This Court in <u>Pollgreen</u>
> further stated that "[a] delay that occurred because the government
> litigated a position that lacked substantial justification is not a
> permissible special factor because any litigation eligible for EAJA
> fees, by definition, involves the government's pursuit of an
> unjustified position." 911 F.2d at 538.

<u>Id.</u> at 1343 (footnote omitted); <u>see also</u> <u>Role Models America, Inc. v. Brownlee</u>,

353 F.3d 962, 969 (D.C. Cir. 2004) (an increase in the cap because of a special

41

factor is justified only when the work performed by the attorney required "specialized skills or knowledge beyond what lawyers use on a regular basis").

"Given that the EAJA constitutes a partial waiver of the United States' immunity, the Act must be strictly construed." Jean, 863 F.2d at 775. While the Court does not doubt LabMD's contention the lawyers at Ropes & Gray are nationwide leaders in cybersecurity litigation (see Pet'r's Corr. Appl. 17), that expertise was not necessary to convince the Eleventh Circuit that the FTC's cease and desist order was too vague to be enforced. See United States v. Willens, 731 F. Supp. 1579, 1581 (S.D. Fla. 1990) (counsel's specialized skill and knowledge could not serve as basis for exceeding EAJA attorney's fee cap absent demonstration that such skill was necessary in case).

But even if such expertise had been necessary to convince the Eleventh Circuit to vacate the FTC's order, that is not a special factor justifying an enhancement in the hourly rate for Ropes & Gray. See Pierce, 487 U.S. at 573 (stating that special factors in the context of § 2412(d)(2)(A)(ii) do not include the "'novelty and difficulty of issues,' 'the undesirability of the case,' [or] 'the work and ability of counsel'"); Pollgreen, 911 F.2d at 537 (noting that the Supreme Court in Pierce "adopted a narrow construction of the 'special factor[s]' that would warrant a departure from the $[125] statutory hourly rate," and adding that

42

the factors "'envisioned by the exception must be such as are not of broad and general application'").

Therefore, the undersigned will not recommend an enhanced hourly rate for the lawyers at Ropes & Gray.  Petitioner did not provide a cost-of-living adjusted hourly rate for attorneys at the New York City office of Ropes & Gray.  Thus, the Court will recommend an award based on the same cost-of-living adjusted hourly rate that Petitioner seeks for the New York City-based attorneys at Wilson Elser—$195.37.

### 3.    Reasonable Hours and Expenses

Attorney's fees and expenses awarded under EAJA must be reasonable.  28 U.S.C. § 2412(d)(2)(A).  The party requesting attorney's fees "bears the burden of establishing the appropriate [number of] hours to be compensated."  Norman, 836 F.2d at 1348; see also Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.").  Any hours that are "'excessive, redundant, or otherwise unnecessary,'" i.e., hours "'that would be unreasonable to bill a client,'" must be excluded by the court.  ACLU of Ga. v. Barnes, 168 F.3d 423, 428 (11th Cir. 1999) (quoting Hensley, 461 U.S. at 434).  Redundant hours typically occur when more than one attorney represents a client.

43

Norman, 836 F.2d at 1301-02.  Under those circumstances, multiple attorneys may be compensated if they are not unreasonably doing the same work and are each being compensated for his or her distinct contribution.  Id. at 1302.[19]  The court must be precise when excluding hours.  Id. at 1301.

Whether the number of hours expended on a case is reasonable is determined by "the profession's judgment of the time that may be consciously billed and not the least time in which it might theoretically have been done."  Norman, 836 F.2d at 1306.  "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."  Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc); see also Hensley, 461 U.S. at 433-34.  The Court must weigh the hours claimed against its own knowledge and experience of the time required for similar activities.  See Allapattah Servs., Inc. v. Exxon Corp, 454 F. Supp. 2d 1185, 1213 (S.D. Fla.

---

[19] Multiple firms and multiple attorneys at each firm worked on this matter for LabMD.  The FTC cannot criticize that practice, however, because it also employed multiple counsel.  "Our court has recognized that the retention of multiple counsel in complex cases is 'understandable and not a ground for reducing the hours claimed' because '[t]he use in involved litigation of a team of attorneys who divide up the work is common for both plaintiff and defense work.'  While duplication of effort is a proper ground for reducing a fee award, 'a reduction is warranted only if the attorneys are *unreasonably* doing the same work.'"  Jean, 863 F.2d at 772-73 (quoting Johnson v. Univ. College, 706 F.2d 1205, 1208 (11th Cir. 1985)).  The FTC has pointed to no instances in which work performed by any attorneys for LabMD was unreasonably duplicative.

44

2006).  Hours spent by an attorney performing clerical tasks are not compensable. See Mobley v. Apfel, 104 F. Supp. 2d 1357, 1360 (M.D. Fla. 2000).  "Fees for fees"–attorney's fees for time spent seeking EAJA fees–are allowable under the EAJA.  Jean, 863 F.2d at 779-80.

"The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.  Where the documentation of hours is inadequate, the district court may reduce the award accordingly."  Hensley, 461 U.S. at 433; see also Rougvie v. Ascena Retail Grp., Inc., No. CV 15-724, 2016 WL 4784121, at *9 (E.D. Pa. Sept. 12, 2016) ("district courts have the authority to reduce a fee award if documentation is inadequate").

There are three types of expenses reimbursable under the EAJA: (1) costs enumerated in 28 U.S.C. § 1920, (2) reasonable expenses of attorneys, and (3) reasonable expenses of expert witnesses.  United States v. Adkinson, 256 F. Supp. 2d 1297, 1319 (N.D. Fla. 2003), aff'd, 360 F.3d 1257 (11th Cir. 2004).  An applicant for reimbursement of expenses bears the burden to produce evidence to permit the court to determine what expenses were incurred in the litigation and their purpose.  Loranger v. Stierheim, 10 F.3d 776, 784 (11th Cir. 1994). Expenses are allowable to the extent they are of a type routinely billed to a client, as long as they are "necessary to the preparation of the case."  Jean, 863 F.2d at

778 (citing § 2412(d)(2)(A)).  Telephone charges, reasonable travel, postage, paralegal time, law clerk time, and computerized research expenses are all compensable under the EAJA.  Id.

### 4.    Components of a Fee Application

In Norman, the Eleventh Circuit provided the following guidance on submission of a fee application:

> As the Supreme Court said in Hensley, "[a] request for attorney's fees should not result in a second major litigation." 461 U.S. at 437, 103 S. Ct. at 1941.  The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates.  Id.  As indicated earlier, fee counsel bears the burden in the first instance of supplying the court with specific and detailed evidence from which the court can determine the reasonable hourly rate.  Further, fee counsel should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity.  Hensley, 461 U.S. at 437 n.12, 103 S. Ct. at 1941 n.2; NAACP v. City of Evergreen, 812 F.2d [1332, 1337 (11th Cir. 1987)].  A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case.

Norman, 836 F.2d at 1303.[20]  A party opposing a fee application must submit specific and reasonably precise objections and proof.  Barnes, 168 F.3d at 428;

---

[20] Although Norman did not arise under the EAJA, its principles are often cited in awarding fees under the EAJA.  See, e.g., Meyer, 958 F.2d at 1033.

46

see also Duckworth v. Whisenant, 97 F.3d 1393, 1397 (11th Cir. 1996) (per curiam) (any objections to the hours claimed must be voiced with exactitude).

### 5.    **Special Master's Recommendations**

As discussed above, the undersigned will not recommend attorney's fees in excess of $125 per hour for work performed in the Enforcement Action or $197.26 per hour for work performed in the 2016 appeal to the Eleventh Circuit. Additionally, the undersigned will not recommend attorney's fees or expenses for collateral actions, lobbying, or unrelated matters; thus, LabMD should receive no compensation for the work of Kilpatrick Townsend and Katten Muchin or for the work of firms who participated in this case when their time was unrelated to it. The Court addresses below the specific requests from LabMD for an award of fees and expenses for work performed by:  (a) Cause of Action Institute; (b) Dinsmore & Shohl; (c) James W. Hawkins, LLC; (d) Wilson Elser; and (e) Ropes & Gray.

### a)    **Cause of Action Institute**

Cause of Action Institute ("CAI") is a public interest law firm that represented LabMD on a pro bono basis during the Enforcement Action.

(Vecchione Decl. ¶¶ 1-2, 5-6, 8, 12.)[21] LabMD may recover attorney's fees for the work of pro bono counsel even though it did not incur these fees. See Cornella v. Schweiker, 728 F.2d 978, 987 (8th Cir. 1984) (parties who were represented by pro bono counsel are not barred from receiving an EAJA award, even though they had not actually been assessed attorney's fees).

According to John J. Vecchione, Esq. of CAI, its attorneys billed time contemporaneously up until some point in 2013. (Vecchione Decl. ¶ 8.) Therefore, LabMD submitted some contemporaneous time records for CAI counsel for 2012-13. (Id. ¶ 8 & Ex. D.) LabMD seeks up to $197.26 per hour for this work. (Hawkins Decl. Ex. H.) As noted above, the Court cannot recommend more than $125 per for legal work before the FTC. After review of these contemporaneous time records, the undersigned reports that the hours sought are reasonable, and thus recommends that LabMD be awarded the following attorney's fees:

---

[21] While CAI also filed an amicus brief in the 2016 appeal to the Eleventh Circuit, LabMD is not seeking any attorney's fees for that work. (Vecchione Decl. ¶ 7.)

| Time Keeper | Hours | Hourly Rate | |
|---|---|---|---|
| Amber Abassi, Esq. | 37.00 | $125 | $ 4,625.00 |
| Kendra Clayton, paralegal | 23.00 | $125 | $ 2,875.00 |
| Ryan Mulvey, Esq. | 16.50 | $125 | $ 2,062.50 |
| Rebekah Ramirez, research asst.[22] | 8.50 | $110 | $   935.00 |
| **TOTALS** | **85.00** | | **$10,497.50** |

Mr. Vecchione states that CAI's practice of keeping contemporaneous time records ended some time in 2013.  (Vecchione Decl. ¶ 8.)  For hours worked for which there are no contemporaneous time records, LabMD asserts that it seeks fees only for occasions when CAI attorneys appeared at depositions or hearings.  To prove that those attorneys performed that work, LabMD submitted cover sheets and appearance pages from transcripts of depositions or hearings at which it asserts CAI attorneys participated.  (Id. ¶ 8 & Ex. E.)[23]  LabMD also seeks to recover the hours spent by CAI personnel reconstructing its records for submission with the Petition.  (Id. ¶ 19.)[24]

---

[22] The EAJA allows an award for paralegal services.  Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 581 (2008).  Although Ms. Ramirez is not a paralegal, this research expense is the type routinely billed to a client and was necessary to the preparation of the case.  See Jean, 863 F.2d at 778.  Moreover, the work she performed was at a lower rate than if performed by a paralegal.

[23] LabMD seeks 439 hours of attorney's fees for the work of counsel from CAI.  (See Vecchione Decl. Ex. H at p. 85.)  As noted in the chart above, CAI produced contemporaneous records reflecting 85 hours of work.  LabMD seeks 354 more hours through this reconstruction (i.e., 439 - 85).

[24] LabMD seeks fees for the following CAI personnel who reconstructed its time records:  five hours for Mr. Vecchione (President and CEO); 58 hours for

49

Courts prefer that counsel submit contemporaneous time records. <u>See</u> <u>Webb v. Bd. of Educ. of Dyer Cty., Tenn.</u>, 471 U.S. 234, 238 n.6 (1985) ("Contemporaneously recorded time sheets are the preferred practice."). However, "[C]ontemporaneous time records are not indispensable where there is other reliable evidence to support a claim for attorney's fees." <u>Jean</u>, 863 F.2d at 772. The undersigned has reviewed the cover sheets and appearance pages from the transcripts of depositions or hearings at which LabMD asserts CAI attorneys participated. (<u>See</u> Vecchione Decl. Ex. E.)[25] However, those documents are not reliable evidence to support a claim for attorney's fees. <u>Jean</u>, 863 F.2d at 772.

For example, fourteen of the transcript excerpts fail to show an appearance by a CAI attorney.[26] While the other transcript excerpts reflect appearances by

---

Nicole W. Van Valkenburg (Chief Strategy Officer); two hours for Anne Kerins (legal secretary); 48 hours for Thomas Kimbrell (Research Analyst); and six hours for Margaret Crocker, (Research Assistant).

[25] Exhibit E to the Vecchione Declaration is found in the Eleventh Circuit's docket as part of two documents filed on October 24, 2018. It begins in Part 3 of 4 (pp. 68-126) and runs through Part 4 of 4 (pp. 1-46).

[26] For that portion of Vecchione Ex. E in Part 3, those transcript excerpts showing no appearance by a CAI lawyer include: (1) Initial Pretrial Conf. of 9/25/13 (Vecchione Decl. Ex. E at 70-71); (2) LeTonya Randolph Dep. (<u>id.</u> at 79-80); (3) Alison Simmons Dep. (<u>id.</u> at 81-82); (4) Jennifer Parr Dep. (<u>id.</u> at 83-84); (5) Lou Carmichael Dep. (<u>id.</u> at 85-86); (6) Closing Argument in FTC Trial of 9/16/15 (<u>id.</u> at 87-89); (7) Trial-In Camera Record of 5/30/14 (<u>id.</u> at 92-93); (8) Trial-Public Record of 7/15/15 (<u>id.</u> at 94-96); (9) Trial-Public & In Camera Record Vol. 3 of 5/22/14 (<u>id.</u> at 97-99); (10) Trial-In Camera Record Vol. 4 of

various CAI attorneys, there is nothing reflecting how much time those attorneys spent preparing for, or attending, the various depositions or hearings. Finally, although LabMD submitted each timekeeper's Eleventh Circuit's Form to Accompany Applications for Attorney's Fees (Vecchione Decl. Ex. L), those forms provide no breakdown of time spent by each attorney on various activities; they simply reflect total hours sought (divided into certain categories) without any indication of what work the attorney performed, when it was performed, and how long it took.

As the party requesting attorney's fees, LabMD bears the burden of establishing the appropriate number of hours to be compensated. Norman, 836 F.2d at 1348; see also Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 527 (1st Cir. 1991) (as a preconditions to a fee award, a litigant must submit a full and specific accounting of the tasks performed, the dates of performance, and the number of hours spent on each task). Fee applications reflecting hours logged and work performed are "essential not only to permit the District Court to make an accurate and equitable award but to place government counsel in a position to

---

5/23/14 (id. at 100-102); and (11) Trial-Public & In Camera Record Vol. 4 of 5/23/14 (id. at 113-14). For that portion of Vecchione Ex. E in Part 4, those transcript excerpts showing no appearance by a CAI lawyer include: (12) Brendon Bradley Dep. (id. at 10-11); (13) Michael Daugherty Dep. (id. at 12-13); and (14) deposition of unknown individual on 1/17/14 (id. at 18).

make an informed determination as to the merits of the application." Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1327 (D.C. Cir. 1982). Given the lack of contemporaneous time records from CAI, and LabMD's failure to submit reliable evidence to support a claim for attorney's fees from CAI's reconstructed records, Jean, 863 F.2d at 772, LabMD has failed to establish the appropriate number of hours to be compensated. The Court cannot assess accurately the work that should be compensated and that which is duplicative or excessive. See Sierra Club v. Mullen, 619 F. Supp. 1244, 1251 (D.D.C. 1985) ("The time logs provide little or no reference to the substance of the work claimed. As such, they are insufficient to enable the Court to access accurately the work that should be compensated and that which is duplicative or excessive.").

LabMD essentially asks the Court to assume that the hours sought are reasonable without explaining what each CAI attorney did and how long each task took. However, the Court cannot make that assumption. Because of the lack of supporting documentation, the undersigned has no basis upon which to recommend any additional attorney's fees for LabMD for the work of CAI's attorneys after 2013 or the work of its staff in reconstructing time records.

LabMD's request for expenses incurred by CAI is also deficient. LabMD provided the Court with a multi-page document entitled, "Cause of Action

Institute Costs," which seeks expenses of $111,524.24. (Vecchione Decl. Ex. I, at pp. 91-99.) This document lists by date (from February 28, 2013 through December 20, 2016) various expenses, like "Meals and Entertainment," "Processing Fees," "Legal Fees," and "Professional Consulting Fees." Mr. Vecchione's Declaration contains no explanation for any of these expenses; he simply states that "Exhibit I is a summary of the costs expended by . . . Cause of Action." (Vecchione Decl. ¶ 22.)

This list fails to provide the Court with any evidence sufficient to determine what expenses were incurred and their purpose. See Adkinson, 256 F. Supp. 2d at 1319 ("An applicant for reimbursement of expenses bears the burden to produce evidence to permit the court to determine what expenses were incurred in the litigation and their purpose."). For example, it is impossible to connect any of these expenses to a specific task performed by a lawyer or paralegal. As with the reconstructed fees, given the lack of supporting information, the undersigned cannot recommend that LabMD be awarded any of the expenses incurred by CAI. In sum, the undersigned recommends that LabMD be awarded attorney's fees of **$10,497.50** for the work of CAI personnel.

**b)**    **Dinsmore & Shohl**

Dinsmore & Shohl represented LabMD in the Enforcement Action. (Sherman Decl. ¶ 3.)  William Sherman, Esq. attached to his Declaration copies of his firm's invoices reflecting contemporaneous time records and expenses incurred or advanced on behalf of LabMD.  (Id. ¶ 9 & Ex. B.)  These invoices reflect time entries from October 4, 2013, through December 15, 2015.  Although LabMD initially submitted redacted copies of those invoices, unredacted copies are now in this Court's docket [9-1].

LabMD's Petition seeks an attorney's fee award of $569,543.18 for the work of Dinsmore & Shohl.  This amount consists of 2,923.10 hours at a cost-of-living adjusted maximum rate of $197.26 per hour for attorneys and $110 per hour for two litigation support personnel and a research librarian.  LabMD also seeks expenses of $92,803.10.  (See Hawkins Decl. ¶ 19 & Ex. J; see also Sherman Decl. Ex. C.)

The record contains 156 pages of Dinsmore & Shohl invoices.  The undersigned has reviewed those invoices and the parties' arguments about them. (See FTC's Suppl. Br. 5-9; Pet'r's Suppl. Br. [16] 4-9).  To its credit, after

54

reviewing the FTC's objections, LabMD withdrew 123.7 hours of attorney time and $7,312.91 in expenses from its Application.[27]

The Court notes below the hours that LabMD has withdrawn with an asterisk (*) and also recommends exclusion of additional hours. The hours that should be excluded from the LabMD's Application (grouped by subject matter where possible) are as follows.

| Date (N.D. Ga. record cite) | Time-keeper | Hours (description) |
|---|---|---|
| | | *Travel time* |
| 11/20/13 ([9-1], at 11) | WAS | 2.00 (travel from D.C. to Pittsburgh)* |
| 11/21/13 ([9-1], at 12) | WAS | 4.00 (travel from Pittsburgh to D.C.)* |
| 12/05/13 ([9-1], at 19) | WAS | 1.50 (travel to and from CAI)* |
| 12/09/13 ([9-1], at 19) | WAS | 2.50 (travel to and from CAI)* |
| 12/12/13 ([9-1], at 20) | WAS | 4.00 (travel to Savannah from D.C.)* |
| 12/13/13 ([9-1], at 20) | WAS | 4.00 (travel to D.C. from Savannah)* |
| 01/08/14 ([9-1], at 29) | WAS | 1.50 (travel to LabMD)* |
| 01/27/14 ([9-1], at 33) | WAS | 5.00 (travel from D.C. to Denver)* |
| 01/28/14 ([9-1], at 34) | WAS | 5.00 (travel from Denver to D.C.)* |
| 02/05/14 ([9-1], at 41) | WAS | 4.50 (travel from D.C. to Atlanta)* |
| 02/10/14 ([9-1], at 42) | WAS | 4.00 (travel from Atlanta to D.C.)* |
| 02/26/14 ([9-1], at 48) | WAS | 3.00 (travel to Atlanta from D.C.)* |
| 03/12/14 ([9-1], at 54) | WAS | 2.00 (travel to CIA)* |
| 04/17/14 ([9-1], at 61) | WAS | 2.50 (travel to LabMD)* |
| 05/18/14 ([9-1], at 78) | SRH | 2.00 (travel to D.C. for trial)* |
| 06/07/14 ([9-1], at 86) | WAS | 4.00 (round trip D.C. to Pittsburgh)* |

---

[27] LabMD initially withdrew expenses of $2,312.91. (Pet'r's Suppl. Br. 4.) Later, LabMD withdrew $5,000 more. (See LabMD's Mot. for Leave to Suppl. the Record [17], at 2 n.2, citing invoice dated 05/29/14 ([9-1], at 50).) The Court addresses expenses infra.

| 01/30/15 ([9-1], at 116) | WAS | 2.00 (travel to CAI)* |
|---|---|---|
| 02/25/15 ([9-1], at 118) | WAS | 2.00 (travel to CAI)* |
| 03/10/15 ([9-1], at 119) | WAS | .20 (travel to CAI)* |
| | | *Press or media work* |
| 11/11/13 ([9-1], at 10) | RDR | 1.60 (MTD; press call)* |
| 11/26/13 ([9-1], at 12) | WAS | 1.00 (communicate re:  press)* |
| 09/18/15 ([9-1], at 143) | WAS | .40 (interview with reporter)* |
| 11/15/15 ([9-1], at 151) | RDR | 2.30 (media for LabMD)* |
| 11/16/15 ([9-1], at 151) | RDR | 2.30 (media for LabMD)* |
| 11/18/15 ([9-1], at 151) | RDR | 3.10 (media for LabMD)* |
| 11/19/15 ([9-1], at 151) | RDR | 3.50 (work on WSJ op-ed)* |
| 11/20/15 ([9-1], at 151) | RDR | 2.90 (media work for LabMD)* |
| | | *Collateral House Oversight Work* |
| 12/09/13 ([9-1], at 20) | WAS | .30 (review comm. with OGR)* |
| 12/12/13 ([9-1], at 20) | WAS | 1.50 (attend mtg. re OGR)* |
| 04/22/14 ([9-1], at 62) | WAS | .50 (tel. conf. re OGR)* |
| 04/23/14 ([9-1], at 62) | WAS | 1.00 (comm. and edits re:  OGR)* |
| 04/24/14 ([9-1], at 63) | WAS | .30 (comm. re OGR briefing)* |
| 04/24/14 ([9-1], at 63) | WAS | .50 (comm. w/Huntington re OGR)* |
| 04/28/14 ([9-1], at 63) | WAS | .60 (tel. conf. re OGR)* |
| 05/28/14 ([9-1], at 81 | WAS | 3.50 (tel. conf. re Oversight |
| 06/04/14 ([9-1], at 85) | WAS | .60 (tel. conf. re Oversight)* |
| 06/04/14 ([9-1], at 85) | WAS | 1.80 (prep. for Oversight presentation)* |
| 06/05/14 ([9-1], at 85) | WAS | 3.50 (prep. for Oversight presentation)* |
| 06/09/14 ([9-1], at 86) | WAS | 2.70 (prep. for mtg. with OGR)* |
| 06/10/14 ([9-1], at 86) | WAS | 2.50 (pre. for mtg. w/ Oversight Chm.)* |
| 06/10/14 ([9-1], at 86) | WAS | 3.50 (attend mtg. w/ Oversight Chm.)* |
| 06/10/14 ([9-1], at 86) | KMS | 1.70 (prep. for Oversight Com. mtg.)* |
| 06/11/14 ([9-1], at 86 | WAS | 2.30 (prep. for Oversight Com. mtg.)* |
| 07/21/14 ([9-1], at 92) | WAS | .50 (re: M. Daugherty's test. at OGR) |
| 07/22/14 ([9-1], at 92) | WAS | .50 (comm. w/Daugherty re: OGR test.) |
| 07/23/14 ([9-1], at 92) | WAS | 1.00 (review Daugherty test. to OGR)* |
| 07/24/14 ([9-1], at 92) | WAS | .30 (disc. w/Daugherty re OGR hr'g)* |
| 07/25/14 ([9-1], at 92) | WAS | .40 (comm. re press/OGR hr'g)* |
| 09/23/14 ([9-1], at 106) | WAS | .10 (review ltr. from Issa to FTC)* |
| 12/02/14 ([9-1], at 115) | WAS | .30 (review ltr. Chm. to FTC)* |
| 12/02/14 ([9-1], at 115) | WAS | .30 (review resp. to Chm.'s ltr.)* |

| | | |
|---|---|---|
| 03/19/15 ([9-1], at 120) | WAS | .10 (review ltr. docs produced OGR)* |
| 05/19/15 ([9-1], at 126) | WAS | 1.50 (review & analyze Issa staff rpt.) |
| 05/28/15 ([9-1], at 126) | WAS | 1.50 (continue review of Issa staff rpt.)* |
| 05/29/15 ([9-1], at 126) | WAS | 1.00 (review OGR rpt.)* |
| | | *Other Collateral Actions* |
| 10/16/15 ([9-1], at 148) | RDR | 3.70 (comm. re SBA matter)* |
| 07/16/14 ([9-1], at 92) | WAS | .10 (Penn. defamation case)* |
| 12/01/14 ([9-1], at 115) | WAS | .60 (Penn. defamation case)* |
| 03/11/15 ([9-1], at 119) | WAS | .20 (respond to court re hearing)* |
| 05/08/14 ([9-1], at 68) | WAS | .50 (tel. conf. with Ga. local counsel)* |
| 01/20/15 ([9-1], at 115) | WAS | 1.00 (read/analyze 11th Cir. case.)* |
| 06/16/14 ([9-1], at 87) | WAS | 3.00 (prep. for hr'g before Tax Court)* |
| 06/10/15 ([9-1], at 97) | WAS | 1.00 (joinder motion)* |
| 06/12/15 ([9-1], at 97) | WAS | .40 (joinder motion)* |
| 06/18/15 ([9-1], at 98) | SRH | 1.00 (tel. conf. re Court's 6/15 order)* |
| 05/08/14 ([9-1], at 76) | WAS | .50 (tel. conf. w/local counsel in GA)* |
| 04/04/14 ([9-1], at 58) | WAS | 1.00 (prelim. injunction hr'g)* |
| 04/04/14 ([9-1], at 58) | WAS | .60 (prelim. injunction hr'g)* |
| 01/17/14 ([9-1], at 31) | SRH | 4.20 (work on discovery in litigation) |
| 02/17/15 ([9-1], at 117) | WAS | .30 (tel. conf. re coverage issues)* |
| 02/18/15 ([9-1], at 117) | WAS | .50 (write covg. ltr. re James River)* |
| 02/19/15 ([9-1], at 118) | WAS | .20 (finalize covg. ltr.)* |
| 02/20/15 ([9-1], at 118) | WAS | .20 (tel. conf. w/covg. counsel)* |
| 02/23/15 ([9-1], at 118) | WAS | .30 (comm. re dismissal of CAI)* |
| 03/02/15 ([9-1], at 118) | WAS | .50 (emails re coverage issues)* |
| 03/03/15 ([9-1], at 118) | WAS | .60 (review of coverage issue)* |
| 03/03/15 ([9-1], at 118) | PJG | .40  (review ins. Policy re covg. issue)* |
| 03/03/15 ([9-1], at 118) | PJG | .30 (email CAI's dispute with insurer)* |
| 03/03/15 ([9-1], at 118) | PJG | .20 (covg. issue with insurer)* |
| 03/03/15 ([9-1], at 118) | PJG | .20 (resv. rights ltr. from James River)* |
| 03/06/15 ([9-1], at 119) | PJG | .20 (covg. dispute with James River)* |
| 03/06/15 ([9-1], at 119) | PJG | .10 (email covg. dispute)* |
| 03/09/15 ([9-1], at 119) | WAS | .50 (tel. conf. re coverage issues)* |
| 03/09/15 ([9-1], at 119) | PJG | .40 (tel. conf. covg. dispute)* |
| 03/09/15 ([9-1], at 119) | PJG | .20 (covg. dispute with James River)* |
| 03/11/15 ([9-1], at 119) | WAS | .50 (covg. dispute with James River)* |
| 03/23/15 ([9-1], at 120) | WAS | .60 (tel. conf. re ins. coverage)* |

| | | |
|---|---|---|
| 03/24/15 ([9-1], at 120) | WAS | .50 (review James River proposal)* |
| 03/25/15 ([9-1], at 120) | PJG | .10 (conf. re James River)* |
| 03/25/15 ([9-1], at 120) | PJG | .20 (review James River proposal)* |
| 03/31/15 ([9-1], at 121) | WAS | .40 (work re James River )* |
| 05/06/15 ([9-1], at 125) | WAS | .40 (work on coverage issue)* |
| 05/12/15 ([9-1], at 125) | WAS | 1.20 (draft contract CAI/James River)* |
| 05/25/15 ([9-1], at 126) | WAS | .50 (send draft to James River atty.)* |
| 06/01/15 ([9-1], at 97) | WAS | .50 (comm. w/James River counsel)* |
| 06/02/15 ([9-1], at 97) | WAS | .60 (comm. w/James River counsel)* |
| 06/03/15 ([9-1], at 97) | WAS | 1.00 (review transition agmt.)* |
| 06/04/15 ([9-1], at 97) | WAS | .40 (comm. w/James River counsel)* |
| 06/08/15 ([9-1], at 97) | WAS | .30 (finalize transition agmt.)* |
| 06/09/15 ([9-1], at 97) | WAS | .70 (review JDA)* |
| 06/23/15 ([9-1], at 98) | WAS | .50 (finalize transfer agreement)* |
| 05/19/15 ([9-1], at 126) | WAS | 1.20 (draft agmt. CAI/Shapira) |
| 05/23/15 ([9-1], at 126) | WAS | 1.00 (analyze agmt CAI/Shapira) |
| | **TOTAL** | **140.60 Hours** |

The FTC also seeks to exclude hours charged for activities it contends are properly billed to overhead, such as attorney time arranging for a conference room (.2), setting up and training on technology by litigation support personnel ([9-1], at 19, 44), processing documents by those personnel (id. at 10-13, 18-24, 29-35, 40-48, 52-53, 55-59, 61-64, 68-71, 76-81, 92, 110, 115-17, 125), and copying a disk containing music tracks (id. at 44.)  (FTC's Suppl. Br. 8.)  LabMD agrees in part with those objections and has withdrawn the following items:

| Date<br>(N.D. Ga. record cite) | Time-keeper | Hours<br>(description) |
|---|---|---|
| 12/17/13 ([9-1], at 21) | KMS | .60 (training case logistics)* |
| 02/12/14 ([9-1], at 42) | WAS | .20 (arrange conf. room in NY)* |
| 02/19/14 ([9-1], at 44) | JC | .40 (create disc with 13 music tracks)* |
| 04/15/14 ([9-1], at 60) | KMS | .60 (file transfer)* |
| | **TOTAL** | **1.80  Hours** |

The Court has reviewed the remaining items that LabMD would not withdraw and finds that the work the FTC finds objectionable is the type routinely billed to a client and appears to have been necessary to the preparation of the case. See Jean, 863 F.2d at 778.  Therefore, the Court will not recommend exclusion of more time.

LabMD seeks 2,842 hours in attorney time (at $197.26 per hour) and 81.10 hours in non-attorney time (at $110 per hour), for a total of 2,923.10 hours. (Hawkins Decl. Ex. J.)  The above tables reflect that 142.40 hours (140.60 + 1.80) should be excluded from the hours sought.  With the exception of .40 billed by JC,[28] the remaining time that should be excluded (i.e., 142 hours) was recorded by attorneys who seek $197.26 per hour.  However, for reasons already discussed,

---

[28] The Court cannot determine who the timekeeper "JC" is.  No one with those initials appears in the forms that accompany fee applications filed in the Eleventh Circuit by Dinsmore & Shohl.  The Court will assume JC was a paralegal given the work description (i.e., create disc with 13 music tracks).

59

the Court cannot recommend more than $125 per hour for work in the Enforcement Action.

After making the above deductions, LabMD should be awarded 2,700 hours of attorney time (2,842 - 142) at $125 per hour and 80.7 hours in non-attorney time (81.10 - .40) at $110 per hour for work.  The undersigned thus recommends that LabMD be awarded the following for the work of Dinsmore & Shohl personnel in the Enforcement Action:

| Attorney Hours | Hourly Rate | |
|---|---|---|
| 2,700 | $125 | $337,500 |
| **Non-Attorney Hours** | **Hourly Rate** | |
| 80.7 | $110 | $   8,877 |
| | **Total Fees** | **$346,377** |

LabMD also seeks expenses of $92,803.10 incurred by Dinsmore & Shohl. (See Hawkins Decl. Ex. J.)  The FTC challenges LabMD's request for certain expenses for airfare, hotel expenses, meals, a rental car, and "other" unspecified or "miscellaneous" expenses.  (FTC's Suppl. Br. 9.)  The FTC also argues that this Court should not recommend an award for what is calls "unreasonable" overhead charges, such as LabMD seeks for audio conferences, photocopies, FedEx fees, messengers, postage, online document retrieval, expert fees, and a filing fee (of $450) which the FTC asserts are unrelated.  (Id.)  As discussed supra

60

note 27, LabMD agreed in part with those objections and withdrew the following

expenses:

| Date (N.D. Ga. record cite) | Amount | Hours (description) |
|---|---|---|
| 11/18/13 ([9-1], at 3) | $   84.72 | Audio Conference* |
| 12/16/13 ([9-1], at 8) | $  450.00 | Filing and Recording Fees* |
| 01/23/14 ([9-1], at 16) | $   41.64 | Audio Conference* |
| 02/28/14 ([9-1], at 27) | $   13.62 | Audio Conference* |
| 02/28/14 ([9-1], at 27) | $   44.85 | Miscellaneous* |
| 02/28/14 ([9-1], at 28) | $  410.00 | Other travel* |
| 03/31/14 ([9-1], at 38) | $   66.08 | Audio Conference* |
| 03/31/14 ([9-1], at 38) | $   59.80 | Miscellaneous* |
| 03/31/14 ([9-1], at 39) | $  409.00 | Other travel* |
| 05/29/14 ([9-1], at 50) | $   54.84 | Audio Conference* |
| 05/29/14 ([9-1], at 50) | $  267.00 | Other travel* |
| 05/29/14 ([9-1], at 50) | $5,000.00 | expert fees* [29] |
| 06/19/14 ([9-1], at 66) | $   21.64 | Audio Conference* |
| 06/25/14 ([9-1], at 73) | $   21.64 | Audio Conference* |
| 07/18/14 ([9-1], at 83) | $  303.37 | Other travel* |
| 08/27/14 ([9-1], at 90) | $   22.32 | Online document retrieval* |
| 08/27/14 ([9-1], at 90) | $    6.00 | Other travel* |
| 04/28/15 ([9-1], at 114) | $    8.96 | Audio Conference* |
| 06/19/15 ([9-1], at 123) | $    9.62 | Audio Conference* |
| 11/18/15 ([9-1], at 147) | $   17.81 | Audio Conference* |
| **TOTAL** | **$7,312.91** | |

As part of its Petition, LabMD sought "expert fees" for Adam Fisk of

$31,705.57.  (See Dinsmore & Shohl invoice dated 07/18/14 [9-1], at 83.)  Mr.

Fisk's invoice to Dinsmore & Shohl [17-2] shows that he billed 59.3 hours at

---

[29] LabMD withdrew $5,000 in expert fees.  (See Pet'r's Mot. for Leave to Suppl. the Record [17], at 2 n.2; see also Dinsmore & Shohl invoice dated 05/29/14 [9-1], at 50.)

$500 per hour (totaling $29,650) and travel costs of $2,055.57, for a total of $31,705.57.  (Id. at 3.)  LabMD is cognizant of the EAJA's limitation on expert fees.[30]  Thus, it asked the Court to direct the FTC to identify the highest rate of compensation paid to its experts so that the Court could make a proper calculation. (See Pet'r's Mot. for Leave to Suppl. the Record 2-3.)  The Court issued that Order [18], and the FTC responded that the highest hourly rate it paid its experts in the Enforcement Action was $450 [19].  Therefore, the bill for Mr. Fisk's time must be reduced by $2,965 (59.3 hours x $50 per hour).  That reduces the amount payable for his time and travel to $28,740.57 ($31,705.57 - $2,965).

With regard to the other expense items to which the FTC objects that LabMD has not withdrawn, the Court has reviewed them, and finds that they are of a type routinely billed to a client.  Moreover, the Court has reviewed the time descriptions that accompany the expenses, and the expenses appear related to those time entries and necessary to the preparation of the case.  Jean, 863 F.2d at 778.  Given the expense items withdrawn by LabMD and the proper calculation of the amount owed for Mr. Fisk's work, the undersigned recommends that

---

[30] Under 28 U.S.C. § 2412(d)(2)(A)(i), "no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States."  Under 5 U.S.C. § 504(b)(1)(A)(i), "no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the agency involved."

LabMD be awarded $82,525.19 ($92,803.10 - $7,312.91 - $2,965) for the expenses advanced by Dinsmore & Shohl.

In summary, the undersigned recommends that LabMD be awarded a total of **$428,902.19** for the work of Dinsmore & Shohl, which consists of $346,377 in attorney's fees and $82,525.19 in expenses.

### c)    James W. Hawkins, LLC

James W. Hawkins was primarily responsible for preparing LabMD's Petition. (Hawkins Decl. ¶ 3.) In the forms that Mr. Hawkins filed with the Eleventh Circuit on October 24, 2018 and January 4, 2019 to support LabMD's application, he seeks $193.12 per hour for his work. His contemporaneous time records show that he spent 41.1 hours preparing the Fee Petition (id. ¶ 8 & Ex. A), at a cost of $7,937.23,[31] and 34.3 hours preparing LabMD's Reply Brief in support of that Petition, at a cost of $6,624.02. (See Suppl. Hawkins Decl. ¶ 4 Ex. A.) LabMD also seeks reimbursement for the time that Mr. Hawkins spent reviewing the FTC's Supplemental Brief, preparing LabMD's Supplemental Brief, and preparing for and appearing at telephonic conferences convened by this Court. (See Suppl. Hawkins Decl. [17-1], at Exs. A-B, reflecting 13.90 hours at $193.12

---

[31] Mr. Hawkins sought $7,937.64 for these 41.1 hours. However, he made a 41 cent error, as $193.12 times 41.1 equals $7,937.23.

63

per hour, for a total of $2,684.37.)  LabMD seeks no expenses incurred by Mr. Hawkins.

The undersigned reports that the number of hours requested (89.3) is reasonable.  Moreover, the hourly rate requested ($193.12) does not exceed the statutory maximum as adjusted for the increase in the cost of living.  Therefore, the undersigned recommends that LabMD be awarded attorney's fees of **$17,245.62** for work performed by Mr. Hawkins.

### d)    <u>Wilson Elser</u>

LabMD's Petition seeks an attorney's fee award of $140,508.57 for the work of the Wilson Elser firm.  This amount consists of 735.80 hours at a cost-of-living adjusted maximum rate of $195.37 per hour for New York City attorneys and $97.68 per hour for two paralegals and a law student.  LabMD also seeks expenses of $567.76.  (<u>See</u> Hawkins Decl. ¶ 21 & Ex. I; <u>see also</u> Bialek Decl. Ex. C.)  Copies of the Wilson Elser invoices are filed as Exhibit A to the Declaration of Adam R. Bialek, Esq., and appear across three parts of the Eleventh Circuit record.  (<u>See</u> Bialek Decl. Part 1, pp. 7-73; Part 2, pp. 1-72; and Part 3, pp. 1-68.)

Wilson Elser's invoices show that the firm's attorneys worked on this matter from December 18, 2013 through July 25, 2018.  (Bialek Decl. Ex. A.)  Mr. Bialek, the partner in charge, avers that Wilson Elser served as counsel for

LabMD in a support role for LabMD, Michael Daugherty and its counsel of record. (Bialek Decl. ¶¶ 3-4.) For example, Wilson Elser performed research, assisted with deposition preparation, summarized depositions, and engaged in pre-trial preparation and post-trial activities. (Id. ¶ 9.)

Markel American Insurance Company ("Markel") provided a Directors and Officers and Employment Practices policy to LabMD. (A copy of this policy is in this Court's docket [16-1].) During a conference call with counsel on September 12, 2019 [15], the Court learned that Markel hired Wilson Elser to represent LabMD under the terms of this policy. Wilson Elser's invoices were addressed to Markel, with the matter identified as "Federal Trade Comm. v. LabMD, Inc.," and many of the entries on those invoices reflect time by Wilson Elser attorneys updating Markel on what was happening in the case.[32] The invoices also reflect

───────────────

[32] The invoices contain numerous time entries which show attorneys at Wilson Elser updating the insurer on the matter's progress, either by telephone, email, or through memoranda which summarized their work, meetings with other counsel representing LabMD, or filings those counsel had made. Although the FTC complains about these entries (see FTC's Opp'n Br. 25-26 n.12), it cites no authority which prevents an EAJA award for this time, and the Court sees nothing unreasonable about keeping the client's insurer up to date. Moreover, as explained by Mr. Bialek during the conference call on September 12, 2019, his firm used these contacts with Markel to document facts and explain litigation strategy in the same way that an attorney might do in drafting memoranda to the file when no carrier is involved.

65

that Wilson Elser attorneys provided substantive assistance to the attorneys who made appearances before the FTC.

Under the EAJA, only a prevailing party who "incurs" legal fees may obtain an award when the government's position is not substantially justified. S.E.C . v. Comserv Corp., 908 F.2d 1407, 1413 (8th Cir. 1990).  In United States v. Thouvenot, Wade & Moerschen, Inc., 596 F.3d 378, 383 (7th Cir. 2010), the court held that attorney's fees may be awarded to a successful litigant even though the fees were incurred by the litigant's insurer.  The undersigned reports that LabMD should recover the fees that Wilson Elser charged to Markel because it indirectly incurred these fees through the payment of insurance premiums to Markel.  See id. ("the insurance premiums are the fee that the insured pays for the insurance company's defense of his case").

After a careful review of the Wilson Elser invoices, the FTC's objections to them (see FTC's Opp'n Br. 25-26), and LabMD's position (see Pet'r's Reply Br. 12), the Court excludes the following time because it was spent on collateral matters for which LabMD may not recover attorney's fees:

| Date (cite to Bialek Decl. filed 10/24/18) | Time-keeper | Hours (description) |
| --- | --- | --- |
| 02/21/14 (Part 1 at 35-36) | GB | .30 (collateral action 11th Circuit) |
|  |  |  |
| 03/21/14 (Part 1 at 45) | AB | 1.30 (collateral action N.D. Ga.) |

66

| 03/21/14 (Part 1 at 46) | AB | 1.70 (collateral action N.D. Ga.) |
|---|---|---|
| 03/21/14 (Part 1 at 46) | AB | 1.10 (collateral action N.D. Ga.) |
| 03/21/14 (Part 1 at 46) | AB | .30 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 46) | GB | .20 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 47) | GB | .20 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 47) | GB | .30 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 47) | GB | .20 (collateral action N.D. Ga.) |
| 03/24/15 (Part 1 at 47) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 47) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 47) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 47) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 48) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 48) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 48) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 48) | GB | .20 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 48) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 48-49) | GB | .10 (collateral action N.D. Ga.) |
| 03/24/14 (Part 1 at 49) | GB | .10 (collateral action N.D. Ga.) |
| 04/04/14 (Part 1 at 55) | GB | .20 (collateral action N.D. Ga.) |
| 04/04/14 (Part 1 at 55) | GB | .20 (collateral action N.D. Ga.) |
| 04/04/14 (Part 1 at 55) | GB | .20 (collateral action N.D. Ga.) |
| 04/04/14 (Part 1 at 55-56) | GB | .20 (collateral action N.D. Ga.) |
| 04/04/14 (Part 1 at 56) | GB | .10 (collateral action N.D. Ga.) |
| 04/04/14 (Part 1 at 56) | GB | .10 (collateral action N.D. Ga.) |
| 04/04/14 (Part 1 at 56) | GB | .10 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 59) | GB | .50 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 59) | GB | .20 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 59) | GB | .10 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 59) | GB | .30 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 59) | GB | .30 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 59) | GB | .20 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 59-60) | GB | .20 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 60) | GB | .20 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 60) | GB | .20 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 60) | GB | .10 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 60) | GB | .10 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 60-61) | GB | .10 (collateral action N.D. Ga.) |

| | | |
|---|---|---|
| 04/10/14 (Part 1 at 61) | GB | .20 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 61) | GB | .10 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 61) | GB | .20 (collateral action N.D. Ga.) |
| 04/10/14 (Part 1 at 61) | GB | .20 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 63) | AB | .90 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 63) | AB | 1.50 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 63) | GB | 1.80 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 63) | GB | 1.30 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 63-64) | GB | .50 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 64) | GB | .30 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 64) | GB | .20 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 65) | GB | .20 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 65) | GB | .20 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 65) | GB | .50 (collateral action N.D. Ga.) |
| 04/17/14 (Part 1 at 65) | GB | 1.60 (collateral action N.D. Ga.) |
| 04/21/14 (Part 1 at 65) | GB | .20 (collateral action N.D. Ga.) |
| 04/21/14 (Part 1 at 66) | GB | 1.00 (collateral action N.D. Ga.) |
| 04/21/14 (Part 1 at 66) | GB | .10 (collateral action N.D. Ga.) |
| 04/22/14 (Part 1 at 67) | GB | 1.60 (collateral action N.D. Ga.) |
| 04/24/14 (Part 1 at 67) | GB | .20 (collateral action N.D. Ga.) |
| 04/24/14 (Part 1 at 67) | GB | .70 (collateral action N.D. Ga.) |
| 04/24/14 (Part 1 at 68) | GB | 1.40 (collateral action N.D. Ga.) |
| 04/25/14 (Part 1 at 69) | GB | .70 (collateral action N.D. Ga.)[33] |
| 04/10/14 (Part 2 at 2) | AB | .10 (collateral action N.D. Ga.) |
| 04/10/14 (Part 2 at 2) | AB | 1.80 (collateral action N.D. Ga.) |
| 05/01/14 (Part 2 at 6) | GB | .40 (collateral action N.D. Ga.) |
| 05/08/14 (Part 2 at 7) | GB | .20 (collateral action N.D. Ga.) |
| 05/13/14 (Part 2 at 9) | GB | .80 (collateral action N.D. Ga.) |
| 05/13/14 (Part 2 at 9) | GB | .60 (collateral action N.D. Ga.) |
| 05/13/14 (Part 2 at 9) | GB | .20 (collateral action N.D. Ga.) |
| 05/13/14 (Part 2 at 9) | GB | .30 (collateral action N.D. Ga.) |
| 05/14/14 (Part 2 at 11) | AB | 1.00 (collateral action N.D. Ga.) |

---

[33] Given that the billing description included other activities but did not separate the time spent on non-collateral matters, the Court deducts .70 of the 1.50 hours recorded.

68

| | | |
|---|---|---|
| 05/15/14 (Part 2 at 13) | GB | .20 (collateral action N.D. Ga.) |
| 04/14/14 (Part 2 at 27) | AB | .60 (collateral action N.D. Ga.) |
| 05/13/14 (Part 2 at 27) | AB | .20 (collateral action N.D. Ga.) |
| 05/13/14 (Part 2 at 27) | AB | .40 (collateral action N.D. Ga.) |
| 11/19/14 (Part 2 at 54) | AB | .30 (collateral action N.D. Ga.) |
| | | |
| 03/03/14 (Part 1 at 42) | GB | .90 (potential 4th Amend claim-Tiversa) |
| 03/03/14 (Part 1 at 42-43) | GB | .90 (potential 4th Amend claim-Tiversa) |
| | | |
| 06/06/14 (Part 2 at 30-31) | GB | .70 (potential copyright action-Tiversa) |
| 06/06/14 (Part 2 at 31) | GB | .60 (potential copyright action-Tiversa) |
| 06/09/14 (Part 2 at 31) | AB | .30 (potential copyright action-Tiversa) |
| 06/09/14 (Part 2 at 31) | AB | .50 (potential copyright action-Tiversa) |
| 06/09/14 (Part 2 at 31) | LKP | 1.60 (potential copyright action-Tiversa) |
| 06/09/14 (Part 2 at 32) | GB | .30 (potential copyright action-Tiversa) |
| 06/09/14 (Part 2 at 32) | GB | .30 (potential copyright action-Tiversa) |
| 06/09/14 (Part 2 at 32) | GB | .50 (potential copyright action-Tiversa) |
| 06/10/14 (Part 2 at 32) | LKP | .80 (potential copyright action-Tiversa) |
| 06/10/14 (Part 2 at 33) | GB | 1.20 (potential copyright action-Tiversa) |
| 06/12/14 (Part 2 at 34) | GB | .30 (potential copyright action-Tiversa) |
| 06/12/14 (Part 2 at 34) | GB | .40 (potential copyright action-Tiversa) |
| 06/12/14 (Part 2 at 34-35) | GB | .90 (potential copyright action-Tiversa) |
| 06/12/14 (Part 2 at 35) | GB | 2.60 (potential copyright action-Tiversa) |
| 06/13/14 (Part 2 at 35) | GB | .40 (potential copyright action-Tiversa) |
| 06/13/14 (Part 2 at 35-36) | GB | .40 (potential copyright action-Tiversa) |
| 06/13/14 (Part 2 at 36) | GB | .70 (potential copyright action-Tiversa) |
| 06/13/14 (Part 2 at 36) | SJB | .70 (potential copyright action-Tiversa) |
| 06/13/14 (Part 2 at 36) | SJB | .30 (potential copyright action-Tiversa) |
| | | |
| 06/10/14 (Part 2 at 33) | GB | .40 (collateral action W.D. Pa.) |
| 11/21/14 (Part 2 at 49) | GB | .20 (collateral action W.D. Pa.) |
| 11/21/14 (Part 2 at 49) | GB | .20 (collateral action W.D. Pa.) |
| 11/26/14 (Part 2 at 49) | GB | .30 (collateral action W.D. Pa.) |
| 10/11/16 (Part 3 at 26) | AB | .30 (collateral action W.D. Pa.) |
| 10/11/16 (Part 3 at 26) | AB | .10 (collateral action W.D. Pa.) |
| | | |
| 06/12/14 (Part 2 at 33) | GB | .30 (collateral House Oversight activity) |

| | | |
|---|---|---|
| 06/20/14 (Part 2 at 38) | GB | .20 (collateral House Oversight activity) |
| 06/27/14 (Part 2 at 38-39) | GB | 1.50 (collateral House Oversight activity) |
| 06/30/14 (Part 2 at 39) | GB | .60 (collateral House Oversight activity) |
| 06/12/14 (Part 2 at 41) | AB | .20 (collateral House Oversight activity) |
| 07/08/14 (Part 2 at 42) | AB | .10 (collateral House Oversight activity) |
| 07/15/14 (Part 2 at 43) | AB | .50 (collateral House Oversight activity) |
| 07/15/14 (Part 2 at 43) | GB | 1.70 (collateral House Oversight activity) |
| 07/16/14 (Part 2 at 43) | GB | .30 (collateral House Oversight activity) |
| 07/17/14 (Part 2 at 44) | GB | .20 (collateral House Oversight activity) |
| 07/24/14 (Part 2 at 44) | GB | .10 (collateral House Oversight activity) |
| 07/25/14 (Part 2 at 44) | AB | .10 (collateral House Oversight activity) |
| 07/28/14 (Part 2 at 44) | GB | .60 (collateral House Oversight activity) |
| 07/28/14 (Part 2 at 44) | GB | 3.20 (collateral House Oversight activity) |
| 07/28/14 (Part 2 at 44-45) | GB | 1.10 (collateral House Oversight activity) |
| 07/29/14 (Part 2 at 45) | GB | 2.80 (collateral House Oversight activity) |
| 07/30/14 (Part 2 at 45) | GB | 2.30 (collateral House Oversight activity) |
| 07/3014 (Part 2 at 45) | GB | 1.00 (collateral House Oversight activity) |
| 05/19/15 (Part 2 at 58-59) | GB | 1.30 (collateral House Oversight activity) |
| 05/20/15 (Part 2 at 59) | AB | 1.00 (collateral House Oversight activity) |
| | | |
| 11/25/15 (Part 2 at 66) | GB | 1.00 (collateral Bivens action D.D.C.) |
| 04/19/16 (Part 3 at 2) | AB | 1.30 (collateral Bivens action D.D.C.) |
| | | |
| 07/13/16 (Part 3 at 8) | AB | .10 (collateral action v. Tiversa et al.) |
| 07/13/16 (Part 3 at 8) | AB | .10 (collateral action v. Tiversa et al.) |
| 07/13/16 (Part 3 at 8) | AB | .10 (collateral action v. Tiversa et al.) |
| | TOTAL | **71.60  Hours** |

LabMD seeks 702.60 hours in attorney time (at $195.37 per hour) and 33.20 hours in non-attorney time (at $97.68 per hour), for a total of 735.80 hours. (Hawkins Decl. Ex. L.)  The above table reflects that 71.60 hours should be excluded from the hours worked by attorneys, leaving 631 attorney hours (702.60 - 71.60).  For reasons already discussed, the Court cannot recommend more than

70

$125 per hour for work in the Enforcement Action, but can recommend $195.37 per hour appellate work.

Thus, the Court must separate time recorded before and after September 29, 2016 (the date the Notice of Appeal was filed in the Eleventh Circuit). The Wilson Elser invoices shows that the bulk of the firm's time was spent on the Enforcement Action. By the Court's calculations, on or after the filing of the Notice of Appeal, Wilson Elser attorneys recorded only 15.40 hours, with no hours recorded by non-attorneys. This means that, for the Enforcement Action, Wilson Elser attorneys recorded 615.60 hours (631 - 15.40), while non-attorneys at Wilson Elser recorded 33.20 hours. Thus, LabMD should be awarded the following fees, separated by work performed on the Enforcement Action and the Eleventh Circuit appeal:

### Enforcement Action Hours

| Attorney Hours | Hourly Rate | |
|---|---|---|
| 615.60 | $125.00 | $76,950.00 |
| Non-Attorney Hours | Hourly Rate | |
| 33.20 | $97.68 | $ 3,242.98 |
| | **Total** | **$80,192.98** |

71

**Eleventh Circuit Appeal Hours**

| Attorney Hours | Hourly Rate | |
|---|---|---|
| 15.40 | $195.37 | $ 3,008.70 |
| Non-Attorney Hours | Hourly Rate | |
| 0.00 | $97.68 | $        0.00 |
| | **Total** | **$ 3,008.70** |
| | | |
| | **GRAND TOTAL** | **$83,201.68** |

The FTC does not challenge expenses of $567.76 incurred by Wilson Elser. Thus, LabMD should be awarded this sum. Therefore, the undersigned recommends that LabMD be awarded **$83,769.44**, which consists of $83,201.68 in attorney's fees and $567.76 in expenses.

### e)    Ropes & Gray

Ropes & Gray represented LabMD on a pro bono basis in its appeal to the Eleventh Circuit. (Cohen Decl. ¶ 2.) Personnel at that firm billed 1,535.50 hours to this matter, with expenses of $2,768.28. (Hawkins Decl. Ex. G; Cohen Decl. Ex. A.)[34] Billing in preparation for the appeal began on August 12, 2016 and extended through June 6, 2018. (Id.) Although Petitioner seeks to recover Ropes & Gray's attorney's fees at rates of up to $725 per hour for a total of $676,008

---

[34] The bulk of those hours were billed by attorneys; only 143.50 hours were billed by a paralegal. Because LabMD seeks more for this paralegal's time ($210 per hour) than this Court may award for an attorney's time ($195.37 per hour), the Court does not distinguish here between attorney and non-attorney time.

72

(id.), as already reported supra, the undersigned cannot recommend enhanced rates for the work of this firm.

The FTC objects because LabMD did not segregate time that Ropes & Gray lawyers spent on unsuccessful or undecided issues from the one issue on which LabMD prevailed—the unenforceability of the FTC's cease and desist order.  (FTC's Opp'n Br. 13, 30-31.)  The FTC thus contends that the time actually spent on the one winning issue (about 28 hours by the FTC's calculations) is all that should be awarded.  (Id. at 32.)  LabMD responds that its lawyers made many arguments and only had to win on one dispositive issue to prevail—which it did.  As the prevailing party, Petitioner asserts that it is entitled to all of its fees.  (Pet'r's Reply Br. 8-9.)

The Court agrees with Petitioner.  (See also supra page 8.)  The cases cited by the FTC, where courts filtered out time spent on successful versus unsuccessful claims, were brought by plaintiffs who won some but not all of the claims they asserted against the government.  (FTC's Opp'n Br. 11-12, citing inter alia, Gay Officers Action League v. Puerto Rico, 247 F.3d 288 (1st Cir. 2001)).  That is not what happened here.  LabMD as a defendant achieved total success, as the Eleventh Circuit vacated the FTC's cease and desist order.  The

73

Petitioner should not be penalized in its victory because some of the arguments it made in self-defense were not addressed by the Circuit.

The FTC does not otherwise challenge any of the time entries in the Ropes & Gray invoices or the expenses that firm advanced for LabMD. Accordingly, the undersigned recommends that Petitioner be awarded attorney's fees of $299,990.64 (1,535.50 hours x $195.37 per hour) and expenses of $2,768.28, for a total award of **$302,758.92**.

## III.    <u>CONCLUSION</u>

For the reasons stated above, the undersigned **REPORTS** that LabMD is the prevailing party in this case and that the FTC's position was not substantially justified; therefore, pursuant to the EAJA, the undersigned **RECOMMENDS** that LabMD be awarded attorney's fees in the amount of **$757,312.44**, and expenses in the amount of **$85,861.23**, for a total of **$843,173.67**. The components of this recommended award are as follows:

| Law Firm | Fees | Expenses | Total |
|---|---|---|---|
| Cause of Action Institute | $  10,497.50 | $        0.00 | $  10,497.50 |
| Dinsmore & Shohl | $346,377.00 | $82,525.19 | $428,902.19 |
| James W. Hawkins, LLC | $  17,245.62 | $        0.00 | $  17,245.62 |
| Wilson Elser | $  83,201.68 | $      567.76 | $  83,769.44 |
| Ropes & Gray | $299,990.64 | $  2,768.28 | $302,758.92 |
|  | **$757,312.44** | **$85,861.23** |  |
|  |  | **GRAND TOTAL:** | **$843,173.67** |

Pursuant to the Eleventh Circuit's Order of May 6, 2019 [1], the Clerk is **DIRECTED** to file this R&R with the Clerk of the United States Court of Appeals for the Eleventh Circuit, who shall be responsible for its service on the parties. Either side may file written objections to this R&R, but objections must be filed with the Eleventh Circuit and served upon the other side and the Special Master within twenty-one (21) days after service of this R&R. The Court will also place this R&R in its docket via CM/ECF.

The Clerk is **FURTHER DIRECTED** to close this case after the expiration of this twenty-one day period (or after the expiration of any extension of that period granted by the Eleventh Circuit).

**SO RECOMMENDED**, this 1st day of October, 2019.


_Walter E. Johnson_
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE


75